2024 IL App (1st) 210043-U

No. 1-21-0043

Order filed March 29, 2024

FIFTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 00 CR 17515 (02) |
| | ) | |
| JOHN SEARLES, | ) | Honorable |
| | ) | William G. Gamboney, |
| Petitioner-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE MITCHELL delivered the judgment of the court.
Justice Mikva concurred in the judgment.
Presiding Justice Oden Johnson dissented with opinion.

**ORDER**

¶ 1  *Held*:  Because petitioner John Searles has not established cause and prejudice for his failure to raise his *Miller*-based sentencing challenge at an earlier proceeding, the circuit court's denial of leave to file a successive post-conviction petition is affirmed.

¶ 2  Petitioner John Searles challenges the circuit court's denial of leave to file a successive post-conviction petition. He argues that new scientific studies regarding brain development in young adults satisfies the cause and prejudice exception to the bar to successive post-conviction petitions. The issue on appeal is whether the trial court erred in concluding that Searles had failed

to overcome this procedural bar. We find that the trial court did not err and that Searles has not established cause.

¶ 3                                    BACKGROUND

¶ 4      In 2002, petitioner John Searles was convicted of the murder and attempted robbery of Anthony Leyva. Searles was 20 years old at the time of the offenses. The circuit court sentenced him to 75 years in prison without good-time credit or the possibility of parole. This court affirmed on direct appeal. *People v. Searles*, No. 1-02-2598 (2004) (unpublished order under Supreme Court Rule 23). Searles then filed his first *pro se* post-conviction petition on March 9, 2005. In it, he argued that his trial counsel was ineffective and that the court had erred by requiring Searles to go to trial with a broken jaw. The petition was dismissed as frivolous and patently without merit. On appeal, this court again affirmed. *People v. Searles*, No. 1-05-2203 (2006) (unpublished order under Supreme Court Rule 23).

¶ 5      Searles later sought leave to file a successive post-conviction petition arguing that the trial court had imposed a *de facto* life sentence without considering his age and attendant characteristics in violation of the eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution. Ill. Const. 1970, art. 1, §11. The circuit court denied leave to file. On appeal, this court reversed and remanded to the circuit court for second-stage proceedings, with one judge dissenting, determining that Searles had satisfied cause and prejudice. *People v. Searles*, 2022 IL App (1st) 210043. The Illinois Supreme Court subsequently issued a supervisory order directing us to vacate our opinion and to reconsider our decision in light of *People v. Moore*, 2023 IL 126461. *People v. Searles*, 468 Ill. Dec. 594 (2023).

¶ 6                                       ANALYSIS

¶ 7     The Post-Conviction Hearing Act allows an imprisoned person to collaterally challenge his conviction on state or federal constitutional grounds. 725 ILCS 5/122-1 (West 2022); see also *People v. Hatter*, 2021 IL 125981, ¶ 22. The Act provides defendants one post-conviction petition as a matter of right. 725 ILCS 5/122-1(f). In order to file a successive post-conviction petition, the defendant must receive leave of court. *Id.* If a defendant fails to raise an argument in the first petition, it is generally waived for any subsequent petition. *Id.* § 5/122-3. However, there are two exceptions to the bar against successive petitions: actual innocence and cause-and-prejudice. *People v. Taliani*, 2021 IL 125891, ¶ 55. To show cause, there must have been "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim in an earlier proceeding." (Internal quotation marks omitted.) *People v. Ortiz*, 235 Ill. 2d 319, 329 (2009) (quoting *People v. Pitsonbarger*, 205 Ill. 2d 444, 460 (2002)). "Prejudice" occurs when the constitutional violation "so infected the entire trial that the resulting conviction or sentence violates due process." *Id.* We review *de novo* a circuit court's denial of leave to file a successive petition. *People v. Jackson*, 2021 IL 124818, ¶ 27.

¶ 8     Searles argues that the Illinois Supreme Court's holding in *People v. Thompson*, 2015 IL 118151, requires reversal. There, on appeal from a section 2-1401 motion for relief from judgment, the defendant raised for the first time an as-applied *Miller*-based sentencing challenge to his mandatory life sentence. *Id.* ¶¶ 21-25. The supreme court concluded that raising such a challenge for the first time on appeal was improper but held that "defendant is not necessarily foreclosed from renewing his as applied challenge in the circuit court" because "the Post-Conviction Hearing Act *** is expressly designed to resolve constitutional issues ***." *Id.* ¶ 44. From this holding,

Searles argues that the court in *Thompson* was suggesting that the defendant there was either capable of satisfying cause-and-prejudice or excused from the analysis.

¶ 9    Searles reads *Thompson* too broadly. There, the court indicated only that raising the sentencing claim for the first time on appeal was improper and that the proper avenue to raise such a claim would be in a post-conviction petition. *Id.* Whether Thompson could overcome any procedural hurdles to bring a successive post-conviction petition was left for the trial court to decide. *Id.* Moreover, even if the court in *Thompson* had determined that the defendant was excused from cause-and-prejudice, this conclusion would provide little value to Searles because *Thompson*'s language permitting "as-applied" *Miller*-based post-conviction challenges has since been expressly limited to "*mandatory* life sentences in *initial* postconviction petitions." (Emphases in original.) *People v. Hilliard*, 2023 IL 128186, ¶ 27 (quoting *People v. Clark*, 2023 IL 127273, ¶ 88). Searles's *de facto* life sentence was discretionary, and he attempted to raise it in a successive postconviction petition; therefore, he "must be able to satisfy the cause-and-prejudice test to do so." *Clark*, 2023 IL 127273, ¶ 88.

¶ 10    Searles next contends that he can satisfy cause-and-prejudice because his initial postconviction petition was filed in 2005, seven years before the United States Supreme Court handed down *Miller v. Alabama*, 567 U.S. 460 (2012), and 13 years before the Illinois Supreme Court decided *People v. Harris*, 2018 IL 121932. Thus, he claims, he could not have raised these arguments earlier. In *Miller*, the United States Supreme Court held that "mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." 567 U.S. at 470. Instead of imposing mandatory sentences, it became incumbent upon courts to consider "an offender's youth and attendant characteristics *** before imposing a particular penalty." *Id.* at 483. The *Miller* court

drew a bright line in defining juveniles as individuals under the age of 18. *Id.* at 465. In applying this holding to the proportionate penalties clause of the Illinois Constitution, however, the Illinois Supreme Court has tacitly endorsed challenges by young adults over the age of 18. *Harris*, 2018 IL 121932, ¶ 48 (holding that a defendant slightly over 18 years old "was not necessarily foreclosed from raising" an "as-applied challenge" to his mandatory *de facto* life sentence); see also *Thompson*, 2015 IL 118151, ¶¶ 44.

¶ 11    However, in *Moore*, the Illinois Supreme Court explained that *Miller* does not provide cause for young adults to raise a claim under the proportionate penalties clause because "*Miller* does not directly apply to young adults." 2023 IL 126461, ¶ 40. Thus, the United States Supreme Court provided Searles with, at best, an analogous fact pattern under the United States Constitution that could potentially help support a claim that Searles could already have raised under the Illinois Constitution prior to *Miller*. See *People v. Patterson*, 2014 IL 115102, ¶ 97 ("A ruling on a specific flavor of constitutional claim may not justify a similar ruling brought pursuant to another constitutional provision."). *Miller* did not create a new claim for young adult offenders nor did it even expand the types of challenges available to postconviction petitioners. For over a century, Illinois courts have recognized that a defendant's youth is a relevant factor in sentencing. See *People ex rel. Bradley v. Illinois State Reformatory*, 148 Ill. 413, 423 (1894) ("There is in the law of nature, as well as in the law that governs society, a marked distinction between persons of mature age and those who are minors,—the habits and characters of the latter are presumably, to a large extent, as yet unformed and unsettled."). Thus, the fact that *Miller* arguably gives Searles a stronger argument today than he had 20 years ago is insufficient to demonstrate cause. *People v. Dorsey*, 2021 IL 123010, ¶ 74 ("*Miller*'s unavailability prior to 2012 at best deprived defendant of

some helpful support for his state constitutional law claim, which is insufficient to establish cause." (Internal quotation marks omitted.)).

¶ 12     Next, Searles argues that he satisfies cause due to the passage of a new parole law in 2019. The law provides that a person who commits first degree murder while "under 21 years of age *** [and who] is sentenced on or after June 1, 2019 *** shall be eligible for parole review *** after serving 20 years or more ***." 730 ILCS 5/5-4.5-115(b) (West 2022). However, this reasoning suffers from multiple flaws. First, post-conviction petitioners can only challenge a trial court's constitutional errors, not statutory errors. 725 ILCS 5/122-1. To the extent that Searles saw the statute as providing evidence of "an evolving standard of decency," the Illinois Supreme Court has recognized that the statute is simply "a policy change rather than a reflection that the previous statutory scheme was abhorrent to the community's moral sense." *Hilliard*, 2023 IL 128186, ¶¶ 36, 39. Second, even if the statute were a basis for a post-conviction petition, the statute is limited by its own terms to prospective relief. 730 ILCS 5/5-4.5-115(b) (allowing parole review only if the defendant is "sentenced on or after June 1, 2019"); see also *Hilliard*, 2023 IL 128186, ¶ 39 (noting that, for a defendant who was 18 years old at the time of the offense, the parole statute provided no benefit because "the legislature chose not to make the provision retroactive.").

¶ 13     Searles also argues that advancements in the understanding of brain development in young adults provides him with cause. In particular, Searles argues that, since his direct appeal and initial petition for postconviction relief, the scientific community has concluded "that the human brain is immature, and not fully developed until an individual reaches his or her mid-20s, and that normal brain development may be delayed, or even arrested, when an individual suffers acute childhood trauma." This argument fails for two reasons.

¶ 14    First, research into young adult and adolescent brain development prior to Searles's trial, direct appeal, and postconviction petition recognized that brain development continues into an individual's 20s. See Jay N. Giedd et al., *Brain Development during Childhood and Adolescence: A Longitudinal MRI Study*, 2 Nature Neuroscience 861 (1999); Elizabeth R. Sowell et al., *Mapping Continued Brain Growth and Gray Matter Density Reduction in Dorsal Frontal Cortex: Inverse Relationships during Postadolescent Brain Maturation*, 21 J. Neuroscience 8819 (2001); Claudia Wallis, *What Makes Teens Tick*, Time (2004). And these studies have been used by legal scholars to argue that young adults and adolescents are less culpable for their crimes than fully developed adults for almost as long. See Adam Caine Ortiz, *Juvenile Death Penalty: Is It "Cruel and Unusual" in Light of Contemporary Standards?*, 17 Crim. Just. 21 (2003); Lucy C. Ferguson, *The Implications of Developmental Cognitive Research on "Evolving Standards of Decency" and the Imposition of the Death Penalty on Juveniles*, 54 Am. U. L. Rev. 441 (2004). While more recent studies may provide better evidence for Searles's argument, those studies do not provide new or undiscovered evidence that Searles could not have presented earlier.

¶ 15    Second, and relatedly, even if scientists had recently discovered that brain development continues into young adulthood, such a discovery would not constitute cause because it would only confirm what Illinois courts already knew. See *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 59 ("If the acquisition of new scientific knowledge to support an already viable claim were all that a defendant needed to show in order to raise the claim years late, then the 'cause' requirement of section 122-1(f) would be a weak threshold indeed."). For newly discovered evidence to constitute cause, the lack of that evidence must have effectively barred the defendant from raising his claim at an earlier proceeding.

¶ 16 The Illinois Supreme Court's holding in *People v. Blalock* is instructive on this point. There, the court explained that cause is satisfied by "a showing that the factual or legal basis for a claim was not reasonably available to counsel." (Internal quotation marks omitted.) *People v. Blalock*, 2022 IL 126682, ¶ 39. In *Blalock*, the defendant satisfied cause when he claimed his confession was coerced but he did not and could not have discovered evidence of a "pattern and practice of police brutality" before his initial postconviction petition. *Id.* ¶ 40. The court emphasized that "evidence of a pattern and practice of police misconduct is part of the factual basis of a coerced confession claim ***." *Id.* ¶ 45. Thus, corroborating evidence "external to the defense," is necessary to effectively raise a claim of police misconduct. (Internal quotation marks omitted.) *Id.* ¶ 44. And the insidious nature of police abuse makes gathering this evidence particularly difficult. *Id.* (quoting *People v. Brandon*, 2021 IL App (1st) 172411, ¶ 57) ("This evidence pertains to the conduct of the State's own agents, toward unknown individuals, during the investigation of other, usually unrelated, cases. The agents in question *** have every incentive to remain mum, if not deny everything."). Accordingly, without corroborating evidence, a defendant is impeded from even raising a coerced confession claim.

¶ 17 These concerns are absent in a sentencing challenge based on the defendant's age. The factual basis for such a challenge is that fully developed adults are different from young adults who are still developing. See, e.g., *People v. Miller*, 202 Ill. 2d 328 (2002). This distinction is a fact that Illinois courts have long recognized. See *Bradley*, 148 Ill. at 422-23 (recognizing that, during sentencing, courts may take into account distinctions between "persons of mature age" and "minor[s] between the ages of 16 and 21 years."). Thus, unlike in *Blalock*, Searles did not need external, corroborating evidence to support his claim before he could raise it. The fact of his youth

was already apparent, and the fact that his youth placed him on different footing than his adult counterparts was a "law of nature." *Id.* at 423.

¶ 18    Searles's capability of raising this argument earlier is further evidenced by the fact that Searles *did* raise a proportionate penalties argument in the trial court at his sentencing:

> "[Defense Counsel]: [W]hat we have is a young man who made a terrible mistake basically ending someone's life; that's a tragedy. But the question I guess becomes is *** there *** hope for rehabilitation. Under the Illinois Constitution, that is something your Honor has to consider. I think there is.
>
> ***
>
> On the other hand, judge, a hundred or 75 or an extended term sentence to a 22-year-old man may be throwing away the key on him and *** I think there is some rehabilitative potential ***."

Further, Searles argued on direct appeal from his conviction that his sentence was excessive and "that the trial court failed to take into account his age, lack of extensive criminal background, and that he had completed his G.E.D. in jail," and we rejected these arguments. *People v. Searles*, No. 1-02-2598 (2004) (unpublished order under Supreme Court Rule 23). Thus, any argument that Searles could not have raised a proportionate penalties argument based on his age earlier is plainly wrong. Accordingly, the circuit court correctly determined that Searles did not show cause. Because Searles cannot show cause, there is no need to reach the question of prejudice. The circuit court did not err in denying Searles leave to file a successive postconviction petition.

¶ 19                                   CONCLUSION

¶ 20    The judgment of the circuit court of Cook County is affirmed.

¶ 21    Affirmed.


¶ 22    PRESIDING JUSTICE ODEN JOHNSON, dissenting.

¶ 23 On this appeal, defendant argues that his *pro se* petition made a *prima facie* showing that his 75-year sentence, without the possibility of either good-time credit or parole, for an offense he committed in 2000 when he was 20 years old, violates the Illinois Constitution's proportionate penalties clause as applied to him, in light of his age, his history of mental health issues, and his exposure to physical abuse and drug use at an early age.

¶ 24 On September 23, 2022, this court reversed the trial court's denial of leave to file, and we remanded for second-stage proceedings consistent with our opinion. A year later, on September 27, 2023, our supreme court issued a supervisory order directing us to vacate our judgment, so that we could consider the effect of the supreme court's recent opinion in *People v. Moore*, 2023 IL 126461, and determine if a different result was warranted. I have considered *Moore* and do not find that it requires a different result, since I would once again reverse and remand for second-stage proceedings. Accordingly, I must respectfully dissent and I believe that additional background facts are necessary to make my point.

¶ 25                                BACKGROUND

¶ 26                          I. Trial & Direct Appeal

¶ 27 The instant appeal concerns the proportionality of defendant's sentence. Prior to this offense, the 20-year old defendant had only one adult conviction, for the relatively minor offense of defacement to property, and no juvenile record. In pronouncing a lengthy sentence, the trial court mentioned in particular, "the nature of the offense" which the court found "to be particularly aggravating," in that "it was premeditated" and "done pursuant to a plan to rob the victim" and defendant "armed himself with a particularly gruesome and deadly weapon." The knife was described at trial as having a curved blade with spikes on the handle and measuring 12 inches in

overall length. The trial court relied heavily on the age of the victim, who was 72 years old, as a particularly aggravating factor; but it did not discuss defendant's young age or any attributes or characteristics relating to under 21-year olds.

¶ 28    The nature of the offense was the primary reason given by the trial court for the long sentence. In sum, the evidence established that the 72-year old victim was married and was also dating Evelyn Rivera who he had met on a phone chat line.   Rivera's best friend was 19-year old Vanessa Padin, and Rivera's boyfriend was 20-year old defendant.   The three young friends talked about scaring Leyva with a knife, so that they could grab a money pouch that Leyva always carried with him.   They talked of using the money to throw a "hotel" party for their friends. Rivera was the one who spoke to Leyva on the phone and arranged for his visit to Rivera's home in the West Lawn neighborhood of Chicago. Rivera also retrieved a knife from her room and handed it to defendant. When the three friends were in Leyva's car, defendant, who was sitting behind the driver, pulled out the knife.   The two girls immediately jumped out of the car and ran, leaving defendant as the only witness as to what happened next in the car.   Defendant testified that things went awry, when the car suddenly jerked back and the knife that defendant was holding cut Leyva's neck.   After the cut to Leyva's neck, the car crashed into a gas station and defendant escaped out of the car door where Padin had previously sat.   Padin testified that stabbing was not part of their plan.

¶ 29    On August 5, 2022, after denying defendant's posttrial motion for a new trial, the court proceeded to sentencing.   The sentencing range for first degree murder was 20 to 60 years (730 ILCS 5/5-8-1(a)(1)(a) (West 2000)), and the sentencing range for attempted armed robbery was 4 to 15 years (720 ILCS 5/8-4(c)(2), 18-2(b) (West 2000), 730 ILCS 5/5-8-1(a)(4) (West 2000)).

While the trial court had the authority to impose an extended-term sentence (730 IlCS 5/5-8-2 (West 2000)) because the victim was over 60 years old (730 ILCS 5/5-5-3.2(b)(4)(ii) (West 2000)), the trial court declined to do so and chose, instead, to consider the victim's age as an aggravating factor within the original 20-to-60-year sentencing range for murder.

¶ 30    In aggravation, the State asked the trial court to consider the victim impact statements from the victim's wife and daughter. The State agreed that defendant's prior criminal history was "not extensive." As already noted, defendant had only one prior adult conviction for the relatively minor offense of criminal defacement to property. In addition, a computer search revealed no juvenile records.

¶ 31    In the presentence investigation report, defendant reported that his father was abusive and, as a result, defendant slept at night with a knife. His father was a heroin addict who physically abused his mother for several years prior to their separation.    Defendant reported that he had been hospitalized for a month at age twelve and again for a month at age 14 in a mental hospital.    With respect to the second hospitalization, defendant reported that his mother thought he was suicidal because he had lost his best friend. Defendant reported that he started smoking marijuana when he was eleven and that he had used cocaine, acid, PCP and ecstasy.    Prior to his incarceration, defendant used PCP every few days and was under its influence when arrested.    He had never received drug treatment.    Defendant described his physical condition as "fair," reporting that he suffered from asthma since birth and used an asthma pump on a daily basis.    In mitigation, defendant submitted letters from his grandmother, mother, sister and brother. Defendant received his GED while in Cook County Jail and expressed remorse for the victim and his family.

¶ 32    The letters that defendant submitted from his family are not in the appellate record.    Other

than to state that he had read the letters, the trial court did not describe the letters, so the record does not reveal their length, level of detail, or what they said. Unlike the letters in mitigation, the victim impact statements from Leyva's wife and daughter are in the record.

¶ 33 Pronouncing sentence, the trial court found:

"I am acutely aware of the nature of the offense as I presided over this trial. And I have taken into consideration the history and character of defendant.

It is clear and has been proven actually by the jury's determination that the victim in this case was over the age of 60. In fact, he was significantly older than that. I find that obviously to be aggravating. It's an aggravating factor under the statutory aggravating factors. In addition, it is a fact that can be used to impose an extended term sentence with regard to [defendant].

The nature of the offense I also find to be particularly aggravating. I find that it was premeditated. That it was done pursuant to a plan to rob [the victim]. [Defendant] armed himself with a particularly gruesome and deadly weapon. ***

On the other hand, I have taken into consideration the matters that were brought to my attention in the letters that I have received from [defendant's] family and what is included in the pre-sentence investigation. I also take into account the fact that [defendant] does not have any significant prior criminal history.

As the result of that, the court has concluded that although it will be within my authority at this time to impose an extended term sentence with regard to the offense of first degree murder, I am going to decline to do so.

I will utilize in my considerations, however, the age of the victim as an aggravating

factor within the original range of sentencing for the offense of first degree murder

I am going to sentence [defendant] to the maximum that I can sentence him for in the original range for first degree murder.

[Defendant] will be sentenced to 60 years ***."

The trial court did not discuss defendant's age.

¶ 34    The court noted that defendant "will serve 100 percent" of the 60-year sentence, and it imposed an additional 15-year consecutive sentence for the attempt armed robbery.   Defense counsel immediately tendered a motion to reconsider sentence which alleged that defendant's sentence was excessive and disparate when compared to the sentences of his co-defendants Rivera and Padin who received 38 years and 14 years, respectively; and the trial court denied the motion.

¶ 35    On direct appeal, defendant claimed, among other things, that his sentences were excessive and that the trial court failed to take into account his age, his lack of criminal background and his completion of a G.E.D. in jail.   Finding no abuse of discretion regarding defendant's sentence, the appellate court found:

"Prior to sentencing, the trial court considered the letters submitted by defendant's family, acknowledged that he did not have any significant prior criminal history, and reviewed the presentence investigation report which mentioned that he had obtained a G.E.D.   Defendant was also allowed to address the court.   During his allocution, he stated that he was sorry and he felt remorse for the victim and his family.   However, the trial court determined that defendant's sentences were appropriate after noting that the victim was significantly over the age of 60, that the crime was premeditated and done pursuant to a plan to rob the victim, and that defendant armed himself with a particularly

gruesome weapon. Given the considerable discretion accorded to the trial court in

determining the appropriate sentence, and recognizing that defendant was eligible for a

maximum term of 100 years on the murder count, we find no abuse of discretion." *People*

*v. Searles*, No. 1-02-2598, at 11 (Mar. 31, 2004) (unpublished order issued pursuant to

Rule 23).

In support, the appellate court cited *People v. Peacock*, 324 Ill. App. 3d 749 (2001), in which the

court found no abuse of discretion in sentencing a 17-year old with no criminal background to 110

years for the murder and car-jacking of a 60-year old victim. *Searles*, No. 1-02-2598, at 11.

¶ 36                                II. Initial Postconviction Petition

¶ 37    In defendant's initial *pro se* postconviction petition, filed on March 9, 2005, defendant

raised a number of claims, including that his trial counsel was ineffective for failing to raise the

issue of defendant's mental health and that the trial court erred when it forced defendant to go to

trial even though defendant had a broken jaw. The trial judge, who was the same trial judge who

had presided over defendant's original trial, dismissed the petition as frivolous and patently

without merit on March 18, 2005.

¶ 38    On August 15, 2006, the appellate court affirmed the dismissal. *People v. Searles*, No. 1-

05-2203 (Aug. 15, 2006) (unpublished order pursuant to Rule 23).  In the order affirming the

dismissal, the court noted that defendant claimed that he had informed his trial counsel that he had

been placed on a number of different medications due to mental disorders, but his counsel told him

not to worry about it and avoid the medication if possible.  Defendant claimed that his trial

counsel was ineffective for failing to raise the issue of defendant's competence to stand trial and

to move for a competency hearing and that his appellate counsel was ineffective for failing to raise

on direct appeal his fitness to stand trial. Defendant's petition claimed that his allegations were supported by evidence of his " 'long history of mental illness as evinced by his frequent hospitalizations beginning in childhood.' " *Searles*, No. 1-05-2203, at 2-3.

¶ 39 The appellate court found that defendant's psychological problems as detailed in the presentence report "related solely to his childhood problems," and that there was no indication that these problems had continued into adulthood. *Searles*, No. 1-05-2203, at 6. Although defendant claimed that he was on different medications due to different mental disorders, the appellate court found that he did not provide "specificity" or evidence that it affected his ability to understand the proceedings against him or participate in his defense. *Searles*, No. 1-05-2203, at 6. As a result, the court did not find this claim persuasive.

¶ 40                                    III. The Instant Petition

¶ 41 On October 23, 2019, defendant filed *pro se*: (1) a motion for appointment of counsel; (2) a petition for leave to file a successive postconviction petition; (3) a postconviction petition; and (4) a supporting memo. Defendant alleged that, although he was 20 years old at the time of the offense, he had the mental capacity of an adolescent, in light of his documented history of mental illness and drug abuse. Defendant alleged that the trial court imposed sentence without any consideration of his age, impetuosity, level of maturity, susceptibility to peer pressure or potential for rehabilitation. Defendant alleged that, without any eligibility for parole or good-time credit, his earliest possible release date was at age 87, if he lived that long. Defendant claimed that his sentence, in light of the truth-in-sentencing laws requiring him to serve his entire sentence, violated both the proportionality clause of the Illinois Constitution and the eighth amendment of the United States Constitution, as applied to him.

¶ 42    In support, he cited precedent and statute decided or enacted only a few months earlier, including: (1) *People v. Othman*, 2019 IL App (1st) 150823, ¶ 90,   where this court found that the Truth in Sentencing Act (735 ILCS 5/3-6-3(a)(2)(i) (West 2006)) was unconstitutional as applied to juvenile defendants; (2) *People v. Buffer,* 2019 IL 122327, ¶ 41, where the Illinois Supreme Court found that a prison sentence of more than 40 years imposed on a juvenile constituted a de facto life sentence; and (3) an under-21 parole statute which provided, in relevant part, that "[a] person under 21 years of age at the time of the commission of first degree murder who is sentenced on or after June 1, 2019 (the effective date of Public Act 100-1182) shall be eligible for parole review by the Prison Review Board after serving 20 years or more of his or her sentence or sentences, except for those subject to a term of natural life imprisonment."   730 ILCS 5/5-4.5-115(b) (West 2020).

¶ 43    Defendant sought "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" and a "hearing in accordance with new case/and state laws."

¶ 44    The first hearing on his petition, for which we have a transcript, occurred on February 21, 2020. An ASA appeared on behalf of the State, and the transcript notes that "[n]one appeared on behalf of the Defendant." The trial judge stated that he had no idea why the matter was here and asked the State if it knew, and the ASA offered to order the "State file."   On April 3, 2020, an ASA was again present when the matter was continued.   On October 30, 2020, over a year after defendant's motion was filed, the trial court indicated in a Zoom proceeding, with an ASA present, that it was denying defendant's motion for leave, for reasons indicated in a written order.

¶ 45    In its written order, dated October 30, 2020, the trial court observed:

"[Defendant] merely reports his age, his lack of a prior criminal background, and that he

'suffered through parental neglect and physical abuse as a child' and 'grew up in a crime and gang infested neighborhood.' [Defendant] makes a conclusory statement that he 'had the mental and maturity level of a child.' "

The trial court found defendant's sentencing claims unpersuasive.

¶ 46   On March 18, 2021, this court granted defendant's motion for leave to file a late notice of appeal from the trial court's October 30, 2020, order and appointed the State Appellate Defender to represent defendant.

¶ 47                              ANALYSIS

¶ 48                       I. *Prima Facie* Showing

¶ 49   Prior to commencing a successive proceeding, a defendant must obtain leave of court to file his or her petition. *People v. Robinson*, 2020 IL 123849, ¶ 43. At this threshold stage, when a defendant seeks leave to file, he or she is required to demonstrate only "a prima facie showing of cause and prejudice." *People v. Bailey*, 2017 IL 121450, ¶ 24. If leave to file is granted, the petition will be docketed for second-stage proceedings. *People v. Sanders*, 2016 IL 118123, ¶ 28. Thus, at this early leave-to-file stage, the petition does not have to make the "substantial showing" that will later be required at a second-stage hearing after counsel is appointed. *Robinson*, 2020 IL 123849, ¶ 58. "[L]eave of court to file a successive postconviction petition should be denied only where it is clear from a review of the petition and attached documentation that, as a matter of law, the petitioner cannot set forth a colorable claim ***." *Sanders*, 2016 IL 118123, ¶ 24.

¶ 50   I find it troubling that the State was present at hearings at which the trial court considered and ultimately denied defendant's motion for leave to file, and that, when the trial court expressed confusion about what the case was about, the State offered to provide its own file—and may have

in fact provided it, for all we know.[1] Our supreme court has found it "improper for the State to provide input to the court before the court has granted a defendant's motion for leave to file a successive petition." *People v. Bailey,* 2017 IL 121450, ¶ 20. The motion for leave to file is directed to the court alone, and it is the court alone who should decide the preliminary legal question of whether the defendant made the required cause-and-prejudice showing. *Bailey,* 2017 IL 121450, ¶ 25.[2] Although input or participation by the State, if any, prior to the trial court's denial was improper, "the relief" remains the same whether or not this error occurred. *Bailey,* 2017 IL 121450, ¶ 41. As a court of review, and "[i]n the interest of judicial economy," we review the motion "ourselves" to determine whether there is "need for remand." *Bailey,* 2017 IL 121450, ¶ 42.

¶ 51 It is also troubling that key parts of the record, such as defendant's videotaped statement, are missing, leaving both this court and the trial court to rely on a one-paragraph summary in an unpublished order that contains confusing ellipses and brackets. The letters from defendant's family, which were submitted by him in mitigation at sentencing, are also not in the appellate record. As a result, almost the entire case that defendant made for mitigation at sentencing is simply not before us. One advantage of a remand for second-stage proceedings is the appointment of an attorney in the trial court who can, hopefully, provide a more complete record before the next step

---

[1] While ASAs may be routinely present in criminal courtrooms, the denial here occurred in a Zoom proceeding during the pandemic, hence, "routine" is not an explanation for the ASA's presence.

[2] Section 3-9005 of the Counties Code (55 ILCS 5/3-9005(a)(7) (West 2020)) permits an ASA to "give the State's Attorney's opinion *** to any county officer *** upon any question ** relating to any criminal or other matter, in which the people or the county may be concerned." However, the question of whether to grant or deny leave to file a petition is not a matter in which "the people," ie. the State, should be concerned.

in the process.[3]

¶ 52                                    II. Cause and Prejudice

¶ 53    To determine whether defendant made a *prima facie* showing, this court reviews defendant's petition *de novo*. *Moore*, 2023 IL 126461, ¶ 31; *Bailey*, 2017 IL 121450, ¶ 13. *De novo* review means that we do the same analysis that a trial judge would have done when reviewing defendant's petition *People v. Meneses*, 2022 IL App (1st) 191247-B, ¶ 16.

¶ 54    As the majority notes, under the cause-and-prejudice test, a defendant must show both (1) cause for his or her failure to raise the claim in an earlier proceeding and (2) prejudice stemming from his or her failure to do so. *Edwards*, 2012 IL 111711, ¶ 22 (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)); *Pitsonbarger*, 205 Ill. 2d at 460 (a showing that a factual or legal basis for the claim was not reasonably available constitutes cause).    In the case at bar, I find defendant has made a *prima facie* showing of both.

¶ 55    First, as to cause, defendant could not have argued that his sentence was disproportionate, in light of the new parole law for under-21-year-olds, prior to its passage into law in 2019.    The law provides that "[a] person under 21 years of age at the time of the commission of first degree murder who is sentenced on or after June 1, 2019 *** shall be eligible for parole review by the Prisoner Review Board after serving 20 years or more of his or her sentence or sentences."    730 ILCS 5/5-4.5-115(b) (West 2020).    Even if he had been sentenced on or after the effective date,

---

[3]    There was no index to most of the appellate record, which was also out of chronological order. Illinois Supreme Court Rule 342 requires the appellant to provide an index to the record that states the nature of each document and "the names of all witnesses and the pages on which their direct examination, cross examination, and redirect examination begins."    Ill. S. Ct. R. 342 (eff. Oct. 1, 2019).    "Illinois Supreme Court Rules *** are mandatory, not optional." *Denton v. Univeral Am-Can, Ltd.*, 2019 IL App (1st) 181525, ¶ 23.

defendant would not have been eligible for earlier consideration under the new law, since he had not served 20 years or more of his sentence until sometime in 2020.

¶ 56     The sentencing transcript establishes that, while the sentencing court focused on the age of the victim, it did not consider any characteristics or attributes of under-21-year-olds, such as their lack of maturity or susceptibility to peer pressure. The trial transcript itself provides evidence of peer pressure and juvenile thinking.   The three youthful offenders wanted to scare an adult into giving them money so they could throw a party.   As Padin, the government witness, testified, a stabbing was never part of their plan.   Without the prodding and pressure by the "girlfriend," this plan would not have been hatched.   It was her knife; she gave it to him; she wanted the party; and she arranged the visit and ride by Leyva. When Rivera initially jumped out of the car, both defendant and Padin were trapped in the back seat as the result of child safety locks, but Rivera opened the door for only Padin. Defendant had literally no way out, unless and until the car stopped.   Defendant had no juvenile record and one adult conviction for the minor offense of defacing property.   His case for mitigation was supported by a number of letters, which neither the court below that ruled on his motion nor this court has had the opportunity to read.[4]  The record also lacks a transcript or video of his statement. If this court is to be more than a rubber stamp, we need a record to review.   Thus, defendant has made a *prima facie* showing for cause and the need for a remand, which will permit the parties and the court to address the holes and troubling aspects of this case.

¶ 57   As to prejudice, the sentencing transcript establishes that the sentencing court did not

_____

[4] Defendant's *pro se* pleading alleged that he had "the mental and maturity level of a child, who suffered from [*sic*] through parental neglect and physical abuse as a child."

consider defendant's potential for rehabilitation. The proportionate penalties clause of our constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art I, § 11. This constitutional provision requires the balancing of the twin goals of retribution and rehabilitation, which requires a careful consideration of all the factors in aggravation and mitigation, including defendant's age and mental health. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). Like the eighth amendment, the proportionate penalties clause of the Illinois constitution embodies our evolving standard of decency. *People v. Miller*, 202 Ill. 2d 328, 339 (2002) ("as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community" underlying both the proportionate penalties clause and the eighth amendment).

¶ 58 However, "the framers" of our state constitution "intended" to "provide a limitation on penalties beyond those afforded by the eighth amendment" and to add the objective of restoring the offender to useful citizenship." *People v. Clemons*, 2012 IL 107821, ¶ 39; *People v. Fernandez*, 2014 IL App (1st) 120508, ¶ 63 ("the Illinois Constitution places greater restrictions on criminal sentencing than the eighth amendment's prohibition"); Ill. Const. 1970, art I, § 11 (sentences must be determined "with the objective of restoring the offender to useful citizenship"). Thus, the proportionate penalties clause goes further than the eighth amendment in offering protection against both oppressive penalties and disproportionality in the law. Under the broader protection provided by our state's own clause, defendant has made a *prima facie* showing that, as applied to him, denying him some meaningful opportunity to demonstrate his potential for rehabilitation, while granting that same opportunity to other similarly situated under-21-year-olds who committed

the same exact offense at a later date, may run afoul of our proportionate penalties clause. See *People v. Hillilard*, 2023 IL 128186, ¶ 29 ("[t]he Illinois Constitution does not limit a proportionate penalties challenge to just juveniles" or individuals with mandatory life sentences).

¶ 59                                    III. *Moore*

¶ 60    The supreme court specifically directed us to consider *Moore* to determine if a different result was warranted in light of it. For the following reasons, I find that *Moore* does not alter the outcome in this case.

¶ 61    In *Moore*, two defendants were sentenced to life without parole for separate murders that they committed when they were 19 years old. Both defendants appealed orders that denied them leave to file successive postconviction petitions that challenged their life-without-parole sentences. On appeal, the supreme court affirmed the trial court's orders. *Moore*, 2023 IL 126461, ¶ 1.

¶ 62    *Moore* is not apposite to our case for a number of reasons. First, in *Moore*, both defendants claimed, in their motions for leave to file successive postconviction petitions, that it was the decision in *Miller*, 567 U.S. 460, that gave them the required cause.   *Moore*, 2023 IL 126461, ¶ 36 (both defendants "claimed the decision in *Miller*, 567 U.S. 460, gave them cause for raising new constitutional challenges to their sentence""). In contrast, in the petition here, defendant claims that his cause stems from new statutory law and new science.

¶ 63    Second, our supreme court rejected the *Miller* claim, finding that, since *Miller* concerned only juveniles, "the decision in *Miller* itself" did not change the law governing young adults. *Moore*, 2023 IL 126461, ¶ 38. "Because *Miller* did not change the law applicable to discretionary life sentences imposed on young adults, including the sentences imposed on both [defendants], *Miller* did not give cause to raise new challenges to their sentences." *Moore*, 2023 IL 126461, ¶

38. For this reason, the *Moore* court found cause lacking under both the eighth amendment and the proportionate penalties clause. *Moore*, 2023 IL 126461, ¶¶ 38, 40 In contrast, the new law and science cited by defendant here is directed specifically toward young adults. *People v. Blalock*, 2022 IL 126682, ¶¶ 41-46 (a claim may be raised in a successive petition based on new facts); *Pitsonbarger*, 205 Ill. 2d at 460 (a showing that a factual or legal basis for a claim was not reasonably available constitutes cause).

¶ 64 Third, the supreme court in *Moore* found: "The evidence and arguments raised at the sentencing hearings for both [defendants] show the parties knew Illinois law recognized the special status of young adults, especially those subject to adverse influences, for purposes of applying the principles of the proportionate penalties clause." *Moore*, 2023 IL 126461, ¶ 42. The opposite was true at defendant's hearing. As we already discussed above in paragraphs 74 and 75, the sentencing transcript establishes that, while the sentencing court focused on the age of the victim, it did not consider any characteristics or attributes of under-21-year-olds, such as their lack of maturity or susceptibility to peer pressure, and it did not consider defendant's potential for rehabilitation.

¶ 65 Fourth, the new parole statute that defendant cites does not apply to the sentences that were at issue in *Moore*, namely, life-without-parole sentences. The new parole statute that defendant cited in his petition provides, in relevant part, that "[a] person under 21 years of age at the time of the commission" of the offense—like defendant— "shall be eligible for parole review *** after serving 20 years or more" of his sentence, "*except* for those subject to a term of natural life" –in other words—except for the defendants like the defendants in *Moore*. 730 ILCS 5/5-4.5-115(h) (West 2020). As a result, the same claim raised by defendant was not a claim available to the defendants in *Moore*. Last but not least, the *Moore* court limited its holding to a consideration of

cause only. *Moore*, 2023 IL 126461, ¶ 42 ("we do not address the issue of whether [defendants] stated a *prima facie* showing of prejudice"). Thus, *Moore* does not affect our analysis of prejudice.

¶ 66      If anything, the supreme court's emphasis in *Moore* on the recognition by Illinois law of "the special status of young adults, especially those subject to adverse influence" reinforces our prior conclusion. *Moore*, 2023 IL 126461, ¶ 42.   As our supreme court emphasized in an even more recent case, "[t]he Illinois Constitution does not limit a proportionate penalties challenge to just juveniles" or to individuals with mandatory life sentences. *Hilliard*, 2023 IL 128186, ¶ 29.

¶ 67      We permitted supplemental briefing, and the State attached to its brief two appellate court cases for our consideration. *People v. Vega*, 2023 IL App (1st) 200661-U; *People v. Bennett*, 2023 IL App (1st) 220805-U. Both are Rule 23 orders and, thus, may not be cited by any party as precedent except in the limited circumstances allowed under Rule 23(e)(1). Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023).   Both affirmed a trial court's denial of leave to file the successive postconviction petition of a young adult, primarily on the ground that "*Miller* does not provide a young adult offender with cause to challenge his sentence in a successive postconviction petition under the proportionate penalties cause"—a fact we can all agree on. *Vega*, 2023 IL App (1st) 200661-U, ¶ 54; *Bennett*, 2023 IL App (1st) 220805-U, ¶ 11.   Both *Bennett* and *Vega* quoted the portion of *Moore* in which the supreme court found that the sentencing transcripts established that the parties and the court all knew and understood the special status of young adults under Illinois law, way back at sentencing, and both cases noted that the sentencing court in their cases had, similarly, considered the mitigating aspects of youth and other factors at sentencing. *Bennett*, 2023 IL App (1st) 220805-U, ¶¶ 12, 14; *Vega*, 2023 IL App (1st) 200661-U, ¶¶ 18-19, 47.   By contrast, this same conclusion simply cannot be made upon a review of the sentencing transcript before us.

In addition, the offenses in both *Bennett* and *Vega* were gang executions by firearm. *Bennett*, 2023 IL App (1st) 220805-U, ¶ 4; *Vega*, 2023 IL App (1st) 200661-U, ¶ 19 (the sentencing court described the shooting as an " 'execution' " and found that the defendant was " 'a danger in this particular community' "). Shooting in a public place is a fact noted by our supreme court as particularly egregious due to its potential for wider injury. *Hilliard*, 2023 IL 128186, ¶¶ 22, 34. Again, this is a fact simply not present in the record before us.

¶ 68 Although neither the supreme court in its supervisory order nor the parties asked us to consider the subsequent *Hilliard* case,[5] we find that it also does not require a different result here. In *Hilliard*, the supreme court held that a mandatory firearm enhancement, as applied to a young adult such that the resulting sentence was less than a *de facto* life sentence, did not shock the conscience. *Hilliard*, 2023 IL 128186, ¶¶ 27, 34, 40.[6] The court observed that a statute may violate the proportionate penalties clause if its penalty is either harsher than a sentence for an offense with the same elements or so cruel as to shock the conscience. *Hilliard*, 2023 IL 128186, ¶ 20. In

---

[5] The supreme court's supervisory order in this case was issued on September 27, 2021, approximately two months before the *Hillard* case was decided on November 30, 2023. *Hillard*, 2023 IL 128186. Although we permitted another round of supplemental briefing after the supervisory order, and the parties' initial briefs were due after *Hillard* was decided, neither one mentioned it. Any argument not made in an appellant or appellee's initial brief is forfeited and may not be raised later in a reply brief or at oral argument. Thus, any arguments that the parties could have made based on *Hillard* were forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

[6] The court stressed and repeated the fact that the *Hillard* defendant did not receive a *de facto* life sentence. For example, the court stated: "even with the discretionary sentence for murder added to the enhancement, defendant's total sentence was 40 years, less than what we have defined as a *de facto* life sentence." *Hillard*, 2023 IL 128186, ¶ 27. The court repeated: "defendant was an adult who received a partially discretionary sentence, and his total sentence did not amount to a life sentence." *Hillard*, 2023 IL 128186, ¶ 34.

*Hilliard*, the defendant argued only the latter. *Hillard*, 2023 IL 128186, ¶ 20.    In support of his shock-the-conscience argument, defendant argued that comments by the legislators who enacted the under-21 parole-review law show that mandatory penalties for young adults now shock the conscience. *Hilliard*, 2023 IL 128186, ¶ 36. In *dicta*, the court stated that the legislature's decision not to apply the law retroactively showed they were not shocked and that it was instead a new policy decision. *Hilliard*, 2023 IL 128186, ¶ 39. In the end, the supreme court carefully considered the defendant's history and record and found that his less-than *de facto* life sentence was not shocking. *Hilliard*, 2023 IL 128186, ¶ 40.[7] By contrast, in the case at bar, the 20-year old defendant, who had no record to speak of, received 75 years, which was a life sentence, and then some.[8]

¶ 69                                    CONCLUSION

¶ 70     For all the foregoing reasons, I would reverse and remand for second-stage proceedings consistent with this opinion. I find that the supreme court's recent decisions in *Moore* and *Hilliard* further support our prior decision by emphasizing the special status of young adults under Illinois law (*Moore*, 2023 IL 126461, ¶ 42) and that an offender does not have to be a juvenile to raise a proportionate penalties challenge (*Hilliard*, 2023 IL 128186, ¶ 29). In the case at bar, where a 20-

---

[7] In reaching this conclusion, the court declined to consider any arguments about mental health, since mental-health allegations were not in the petition. *Hilliard*, 2023 IL 128186, ¶ 32. By contrast, in the case at bar, defendant's petition alleges mental health issues.

[8] Further distinguishing *Hilliard* is the fact that the supreme court there was considering the constitutionality of mandatory firearm enhancements, a subject not at issue here. *Hilliard*, 2023 IL 128186, ¶ 22. In affirming the sentence before it, the court observed "that the presence of firearms during an offense extends the danger to innocent bystanders [citation], and here defendant shot at [the victim] in a public housing complex." *Hilliard*, 2023 IL 128186, ¶ 34. By contrast, in the case at bar, no firearm was involved, and the offense occurred in a closed and private space.

year old with no possibility for parole will first be eligible for release when he is well over eighty, if he lives that long; where the record does not indicate a concern for his rehabilitative potential and return to useful citizenship as our constitution requires; where other similarly situated 20-year olds will receive an opportunity to show their rehabilitative potential; where he has alleged mental health issues that were not at issue in *Moore*; where he had no criminal record to speak of; and where no crime would have been committed but for his codefendants; I find that this *pro se* defendant has met the very low threshold needed for leave to file and to have an attorney review and shape his allegations into more legally articulate claims.    Further, the appointment of counsel will, hopefully, redress the troubling aspects of this case, such as the absence of the mitigation evidence in the record before us and the apparent provision of the State's file in the proceeding below which, whether routine or not, should not have happened. *Bailey,* 2017 IL 121450, ¶ 20 (it is "improper for the State to provide input to the court before the court has granted a defendant's motion for leave to file a successive petition").    If our proportionate penalties clause is to remain alive and well, and if *Moore* and *Hilliard* both left open a door for some successive petitions, as they appear to have done, then some petitions must be able to clear the very low threshold of leave to file, and I find that this one does, for all the reasons noted above.