NOTICE

Decision filed 07/14/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230511-U

NO. 5-23-0511

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 91-CF-782 |
| | ) | |
| TYLOS JONES, | ) | Honorable |
| | ) | Julie K. Katz, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court.
Justices Cates* and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: We reverse the trial court's judgment granting defendant a resentencing hearing where we are bound by the supreme court's decision in *People v. Moore*, 2023 IL 126461, ¶ 42, which concluded that *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny, did not provide cause for a young-adult offender to raise a proportionate penalties clause claim in a successive postconviction petition. We also remand with directions that defendant's successive postconviction petition be dismissed.

¶ 2    Following a third-stage evidentiary hearing under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2022)), the trial court granted defendant Tylos Jones's second amended postconviction petition, finding that he was entitled to a new sentencing hearing. The State timely appealed and claims that the trial court erred in denying its motion to dismiss as

_____

*Originally Justice Welch was assigned to the panel. Justice Cates was later substituted on the panel and has read the briefs

1

defendant did not establish cause to file his successive postconviction petition. For the following reasons, we reverse and remand.

¶ 3                                  I. BACKGROUND

¶ 4      Defendant was convicted of the first degree murders of Mysty Walton, defendant's former girlfriend, and Ann Walton, Mysty's mother, and sentenced to natural life imprisonment. His conviction was affirmed on direct appeal. See *People v. Jones*, No. 5-93-0059 (1995) (unpublished order under Illinois Supreme Court Rule 23). In October 1994, while the direct appeal was pending, defendant filed a *pro se* postconviction petition. Defendant's postconviction petition advanced to the second stage of the postconviction proceedings, and the trial court appointed him counsel. In March 1996, defendant's appointed counsel filed an amended postconviction petition, challenging, *inter alia*, his mandatory life imprisonment sentence on constitutional grounds. Subsequently, the State filed a motion to dismiss the amended petition and then an amended motion to dismiss.

¶ 5      In October 1996, the trial court granted the State's amended motion to dismiss on all but two claims and advanced those two claims to a third-stage evidentiary hearing. Following the hearing, the trial court denied defendant's amended postconviction petition with prejudice. On appeal, defendant's appointed counsel filed a motion to withdraw as counsel. On February 18, 2000, this court granted counsel's motion to withdraw and affirmed the denial of defendant's amended postconviction petition. See *People v. Jones*, No. 5-97-0919 (2000) (unpublished order under Illinois Supreme Court Rule 23).

¶ 6      In May 1999, while his initial postconviction appeal was pending, defendant filed a *pro se* second postconviction petition. The trial court subsequently dismissed this *pro se* petition, finding that it was premature since the appeal from the denial of the amended postconviction petition was pending. The trial court also found that the *pro se* petition was repetitive in nature and barred by

the trial court's decision on the first petition. On appeal, defendant argued that this court should remand for resentencing because the Illinois life-imprisonment statute (Ill. Rev. Stat. 1989, ch. 38, ¶ 1005-8-1(a)(1)(c) (now 730 ILCS 5/5-8-1(a)(1)(c) (West 2000))) violated his due process rights by subjecting him to increased penalties without "providing notice of facts qualifying" him for a term of natural life imprisonment. This court disagreed with that argument and affirmed the trial court's dismissal of defendant's *pro se* second postconviction petition. See *People v. Jones*, No. 5-99-0485 (2001) (unpublished order under Illinois Supreme Court Rule 23).

¶ 7    On February 13, 2018, defendant filed a *pro se* motion for leave to file a successive petition for postconviction relief, a memorandum in support of the successive postconviction petition, and his successive postconviction petition. In the motion, defendant argued that, pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny, the statute mandating a life sentence was unconstitutional as applied to him because the trial court was precluded from considering his age, intellectual disability, substance abuse history, and family background as factors in mitigation. Defendant argued that, had the trial court been able to consider the evidence that was presented at his sentencing hearing about his intellectual disability and rehabilitative potential, the trial court would not have imposed a natural life sentence.

¶ 8    On February 22, 2018, the trial court denied defendant leave to file his successive postconviction petition, finding that there were no new issues raised in the petition. On appeal, defendant filed a motion for summary relief, arguing that his claim that his mandatory life sentence was unconstitutional under *Miller* and its progeny met the cause and prejudice test applicable to successive postconviction petitions. In the motion, defendant argued, and the State did not dispute, that he had satisfied the cause and prejudice test for successive postconviction petitions because

3

the substantive rule announced in *Miller* was unavailable to him at the time he filed his previous postconviction petitions, and the rule applied retroactively on collateral review.

¶ 9    On January 27, 2020, this court granted defendant's unopposed motion for summary relief, finding that defendant had satisfied the cause and prejudice test for successive postconviction petitions. This court concluded that a postconviction proceeding would afford defendant the opportunity to elicit evidence about how the evolving science on juvenile maturity and brain development that formed the basis of the *Miller* decision applied to his particular facts and circumstances and would create a record sufficient for appellate review. Consequently, this court reversed the trial court's denial of defendant's leave to file a successive postconviction petition and remanded with directions to docket defendant's successive postconviction petition for second-stage postconviction proceedings. See *People v. Jones*, No. 5-18-0231 (2020) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 10   On remand, the trial court docketed defendant's successive postconviction petition for second-stage postconviction proceedings and appointed him counsel. On October 15, 2020, defendant's counsel filed a second amended postconviction petition, arguing that the mandatory life sentencing scheme was unconstitutional as applied to defendant where the new evidence concerning adolescent brain development entitled him to the sentencing protections set forth in *Miller*, and *People v. Davis*, 2014 IL 115595, as the trial court could not consider his youth, intellectual disabilities, and impoverished background at sentencing. Defendant noted that, at the time of the offenses, he was 19 years old; he had an intelligence quotient (IQ) of 64, which was the intellectual/emotional level of a 10- or 11-year old; he was in the process of a deeply emotional breakup with one of the victims; and he was manipulated and pressured by his codefendant into participating in the crime. He argued that the emerging research indicated that 18- to 21-year-old

4

young adults lacked the maturity to control their impulses and to fully consider the future consequences of their actions, which made them unlikely to be deterred by any knowledge or likelihood of the severity of the punishment. The research also indicated that young adults were susceptible to peer pressure and emotional influence and had a much better chance at rehabilitation as they matured than adults. Thus, defendant argued that, based on this research, the juvenile protections announced in *Miller* and *Davis* should be applied to him.

¶ 11    Defendant argued that he would not have committed the offenses but for his heightened susceptibility to peer pressure and emotional immaturity. He noted that, while incarcerated, he had matured, had been a model inmate, and had been rehabilitated. Given the weight of the new scientific evidence, and how it applied to his case, defendant requested a third-stage evidentiary hearing where the trial court would determine whether the mandatory sentencing scheme was unconstitutional as applied to him, and whether he was entitled to a new sentencing hearing.

¶ 12    In support of his successive postconviction petition, defendant attached an affidavit from Dr. Erin Bigler, a neuropsychologist and professor of psychology and neuroscience, in which Dr. Bigler explained that the key brain systems and structures, especially those involved in self-regulation and higher-order cognition, continued to mature throughout adolescence. Dr. Bigler explained that it was previously believed that brain maturation ended during late childhood to mid-adolescence, but with the advances in neuroscience, that conclusion had been challenged in the late 1990s and 2000s. Dr. Bigler explained that further studies conducted following the United States Supreme Court's decisions in *Roper v. Simmons*, 543 U.S. 551 (2005), and *Miller v. Alabama*, 567 U.S. 460 (2012), had shown that several aspects of brain development affecting judgment and decision-making continued well beyond the age of 20. Dr. Bigler noted that it was now widely accepted that brain maturation continued into young adulthood. Dr. Bigler concluded

5

that the neurobiological and psychological immaturity of the sort that the Supreme Court referenced in its opinions on the diminished culpability of minors was also characteristic of individuals in their late teens and early 20s and that the same arguments that were made supporting the elimination of natural life without parole sentences for those under 18 could be made for those under 21.

¶ 13 Also attached to the successive postconviction petition were several articles explaining the applicable neuroscience principles underlying defendant's claim and a report from Dr. James Garbarino, a developmental psychologist, explaining why the developments in science justified extending the protections in *Roper* and *Miller* from age 18 to age 25. In addition, a June 25, 2020, affidavit from defendant was attached in which defendant indicated that he was 19 years old at the time the offenses were committed; he had no independent motivation to commit the offenses but did so at the insistence and direction of a codefendant; at the time the offenses were committed, he was emotionally distraught due to a breakup; and his codefendant used his mental state to manipulate him into assisting in the offenses. On October 16, 2020, counsel filed a certificate in compliance with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017).

¶ 14 On November 6, 2020, the State filed a motion to dismiss defendant's successive petition, arguing that the successive petition was untimely because the proceedings on defendant's previous petition concluded more than 16 years ago, there was no allegation that the delay in filing was not due to defendant's culpable negligence, and he did not argue any new change in the law that would justify the 16-year delay. The State argued that, although defendant described the research attached to his petition as new evidence, defendant was ineligible to be tried as or considered as a juvenile under the existing body of governing law, and thus the research was immaterial to his case. Moreover, the State noted that nearly one-half of the articles attached to defendant's petition were

6

published prior to *Miller*. The State argued that, while there was undoubtedly ongoing research about the development of the human mind, this was not new information or new evidence, and defendant could have reasonably located this evidence at least 10 years ago. Thus, the State argued that defendant could have raised his claims in prior proceedings, and his failure to do so despite the availability of this research constituted culpable negligence.

¶ 15    In addition, the State argued that defendant's claim was forfeited because, although defendant argued in his posttrial motion that his mandatory life sentence was unconstitutional, he did not raise it in his direct appeal. The State contended that defendant's youth was known at the time of his sentencing, at the time that he filed his posttrial motion, and at the time that he filed his subsequent appeals. Finally, the State argued that defendant's postconviction petition did not make a substantial showing of a constitutional violation under either the state or federal constitution.

¶ 16    On March 15, 2021, the trial court granted the State's motion to dismiss with regard to defendant's argument that he was entitled to resentencing because his natural life sentence violated the eighth amendment of the United States Constitution (U.S. Const., amend. VIII). However, the trial court denied the motion to dismiss regarding defendant's argument that his natural life sentence violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). The trial court found that defendant had made a sufficient showing to be given the opportunity, in a postconviction proceeding, to develop an evidentiary record at the trial level in support of his as-applied challenge to the constitutionality of his sentence.

¶ 17    On October 20, 2022, the trial court entered an order, indicating that the parties had stipulated that the trial court would consider and take judicial notice of Dr. Garbarino's testimony

on January 11, 2023, in defendant's case.[1] At this hearing, Dr. Garbarino, who was testifying as an expert witness in developmental psychology, testified about the general scientific principles of brain development in young adults. Dr. Garbarino testified that there had been considerable discussion about when adolescence ended and the concept of emerging adulthood in the "last couple of decades to deal with the fact" that there was a transitional period between being a juvenile and reaching "full adulthood." He explained that emerging adulthood was from age 18 to some point in the 20s. He also explained that technological developments have allowed for the direct study of human brains. As the technology became more available and "increasingly applied to studying populations of normal or relatively normal individuals," that led to a "situation where *** neuroscience [was] informing developmental psychology about adolescence and emerging adulthood in a way that [was] historically new."

¶ 18    Dr. Garbarino explained that brain development was a gradual process, and full maturity could not be presumed until about age 25. He then explained the various aspects of brain development and brain structure that were still maturing at age 18, about how early trauma and/or adverse environmental conditions could impair that development, and about how brain structure and access to education impacted rehabilitation. Dr. Garbarino concluded that the factors

---

[1]The transcript of Dr. Garbarino's January 11, 2023, testimony is not included in this record on appeal. However, since the testimony was also used in other cases, the transcript is included in the record on appeal in *People v. Thompson*, No. 5-23-0682, which is currently on appeal before this court. Thus, the defendant requests that we take judicial notice of the transcript. In making this request, the defendant notes that Illinois Rule of Evidence 201 (eff. Jan. 1, 2011) permits courts to take judicial notice of adjudicative facts. A judicially noticed fact is defined as one not subject to reasonable dispute in that it is either generally known within the territorial jurisdiction of the trial court or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Ill. R. Evid. 201(b) (eff. Jan. 1, 2011). In general, a court may take judicial notice of its own records, and the facts contained in those records. *In re Gonder*, 149 Ill. App. 3d 627, 629 (1986). Because *Thompson* was pending in this court during the pendency of the instant appeal, and the trial court took judicial notice of and considered the January 11, 2023, transcript when deciding to grant defendant a new sentencing hearing, we will take judicial notice of the January 11, 2023, transcript included in the *Thompson* record. Also, we note that it does not appear that the State objects to us taking judicial notice of this transcript.

established in *Miller* should be applied to emerging adult offenders and that there had been additional data and science related to 18- to 20-year-olds since *Miller*.

¶ 19    Subsequently, at the March 24, 2023, third stage evidentiary hearing, Dr. Garbarino testified about how the advances in neuroscience that he discussed at the January hearing applied to defendant. Dr. Garbarino explained that he had given defendant the adverse childhood experience scale questionnaire, which was "very powerful in predicting violent behavior, as well as *** other self-destructive and socially costly behaviors." Also, Dr. Garbarino had reviewed various documents about defendant's disciplinary record while incarcerated, defendant's legal history, and his life, which included information about his rehabilitation while incarcerated. Dr. Garbarino explained that, since defendant was 19 years old at the time of the offenses, defendant's brain was immature, particularly with regard to executive function, which included decision-making, anticipating consequences, weighing costs and benefits, and emotional intelligence. Dr. Garbarino noted that defendant had experienced severe adversity in his childhood, which compounded the inherent limitations in adolescent brains and increased the risk of self-destructive behavior. Dr. Garbarino concluded that defendant was capable of rehabilitation as demonstrated by his "extraordinary record of progress" in overcoming adversity while incarcerated.

¶ 20    Dr. Garbarino noted that defendant was evaluated in 1992 to determine whether he was fit to stand trial, and he was assessed as intellectually disabled with an IQ score of about 62 to 64, which meant that his cognitive level was of a 10- or 11-year-old at the time. Based on defendant's score on the adverse childhood experience scale, Dr. Garbarino noted that defendant suffered an unusually high number of adverse childhood experiences; that defendant's score and his childhood were worse than 999 out of 1,000 children growing up in the United States; and that it would have been very surprising if defendant had not demonstrated significant, severe issues by the time that

9

he was 19. Dr. Garbarino noted that defendant had substance abuse issues, suffered depression, and exhibited suicidal behavior and violent delinquency. Consequently, Dr. Garbarino concluded that the protections afforded to juveniles at sentencing should be applied to defendant.

¶ 21 On June 29, 2023, the State filed a written posthearing argument, arguing that, given the lack of information as to defendant's condition at the time of sentencing, Dr. Garbarino's opinions did not merit much weight. The State recognized that the science that Dr. Garbarino testified about was not and could not have been available to the trial court at the time of the defendant's sentencing. However, the State argued that Dr. Garbarino's testimony mainly consisted of a discussion of how things had changed in the field of neurodevelopment since about 2000 and included almost nothing specific to defendant. Moreover, the State noted that, following Dr. Garbarino's testimony in March 2023, the supreme court issued its opinion in *People v. Moore*, in which the supreme court found that *Miller* did not give 19-year-old young adults cause to raise successive postconviction claims under the proportionate penalties clause of the state constitution. *People v. Moore*, 2023 IL 126461, ¶ 42.

¶ 22 On July 5, 2023, the trial court granted defendant a new sentencing hearing. In the order, the trial court noted that the recent case law had opened the door for young-adult offenders to demonstrate that their own specific characteristics and circumstances were so like those of a juvenile that the imposition of a life sentence, absent the necessary considerations established in *Miller*, violated the proportionate penalties clause. The trial court found that defendant's sentencing hearing was not *Miller*-compliant as the sentencing court had imposed the statutory sentence of life imprisonment without parole without considering defendant's youth or rehabilitative potential as mitigating evidence. The trial court noted that Dr. Garbarino's testimony demonstrated that defendant was more like a juvenile than an adult and thus should enjoy the

10

protections established in *Miller* before a life sentence was imposed. Thus, the trial court concluded that defendant was entitled to a new sentencing hearing. The trial court's order did not address the supreme court's decision in *Moore*. On July 14, 2023, the State filed an affidavit, asserting that the trial court's order substantially impaired its ability to prosecute the case, and a notice of appeal.

¶ 23                                  II. ANALYSIS

¶ 24    The Post-Conviction Hearing Act (Act) allows an incarcerated defendant to challenge his conviction by asserting that his conviction was the result of a substantial denial of his constitutional rights. 725 ILCS 5/122-1 (West 2016). The Act is not a substitute for an appeal, but rather, a collateral attack on the final judgment. *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act sets forth a three-stage process for adjudicating a defendant's claims. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). At the first stage, the circuit court independently reviews the petition to determine whether it is frivolous or is patently without merit. *Id.*; 725 ILCS 5/122-2.1 (West 2016). If the petition is not dismissed for being frivolous or patently without merit, it advances to the second stage of the proceedings, at which an indigent defendant is entitled to appointed counsel, the petition may be amended, and the State may answer or move to dismiss. *Edwards*, 197 Ill. 2d at 245-46; 725 ILCS 5/122-5 (West 2016). At this stage, the trial court determines whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. *Edwards*, 197 Ill. 2d at 246. If no showing is made, the petition is dismissed. *Id.* However, if a substantial showing of a constitutional violation is made, the petition advances to the third stage, and the trial court conducts an evidentiary hearing. *Id.*

¶ 25    The Act contemplates the filing of only one postconviction petition. 725 ILCS 5/122-1(f) (West 2016); *Edwards*, 2012 IL 111711, ¶ 22. Accordingly, issues that were not presented in an

11

original or amended petition are forfeited, and issues that have previously been raised and addressed on appeal will be barred pursuant to *res judicata*. *Edwards*, 2012 IL 111711, ¶ 21; *People v. Sanders*, 2016 IL 118123, ¶ 24. However, the procedural bars of forfeiture and *res judicata* can be overcome where fundamental fairness requires. *People v. Pitsonbarger*, 205 Ill. 2d 444, 458 (2002). In proceedings under the Act, fundamental fairness is established by satisfying the cause and prejudice test, which is codified in the Act. *Id.*; 725 ILCS 5/122-1(f) (West 2016).

¶ 26    To obtain leave of court to file a successive postconviction petition, the defendant must demonstrate cause for his failure to raise the claim in the initial petition and prejudice from that failure. 725 ILCS 5/122-1(f) (West 2016). For cause, the defendant must identify an objective factor that impeded his ability to raise a specific claim during his initial postconviction proceedings. *Pitsonbarger*, 205 Ill. 2d at 460. For prejudice, the defendant must demonstrate that the claim not raised during his initial postconviction proceedings so infected the trial that the resulting conviction or sentence violates his due process rights. *People v. Lusby*, 2020 IL 124046, ¶ 27. Failure to state either cause or prejudice will be detrimental to a motion seeking leave to file a successive petition. *People v. Clark*, 2023 IL 127273, ¶ 47.

¶ 27    "The legislature intended for the courts to make cause-and-prejudice determinations on the pleadings and not by evidentiary hearings." *Id.* The trial court does this by conducting a preliminary screening to determine whether the motion seeking leave to file the successive postconviction petition adequately alleges facts that make a *prima facie* showing of cause and prejudice. *Id.*

¶ 28    Here, defendant contends that the State is precluded from arguing that he had not established cause as this court had already made that determination in the previous decision filed

12

January 27, 2020. Thus, defendant argues that, under the law of the case doctrine, we are bound by our previous decision and should decline to revisit the issue.

¶ 29    Under the law of the case doctrine, rulings made on questions of law and fact decided in a previous appeal are binding on the trial court on remand as well as on the appellate court in subsequent appeals. *Radwill v. Manor Care of Westmont, IL, LLC*, 2013 IL App (2d) 120957, ¶ 8. However, there are two recognized exceptions to the law of the case doctrine: (1) a higher reviewing court makes a contrary ruling on the same issue subsequent to the lower court's decision, or (2) a reviewing court finds that its prior decision was palpably erroneous. *Id.* ¶ 10.

¶ 30    In arguing that this court should find that defendant has not met the cause and prejudice test for filing a successive postconviction petition, the State recognizes the binding effect of the already decided questions of law and fact in the previous appeal. However, the State argues that, because this court is bound by the supreme court's decision in *People v. Moore*, 2023 IL 126461, both exceptions to the law of the case doctrine apply. Thus, the State argues that reversal is required, even though this court had already determined that defendant had established cause to file a successive postconviction petition, and defendant had already been given a third-stage evidentiary hearing.

¶ 31    In January 2020, this court granted defendant's unopposed motion for summary remand, finding that he had established cause and prejudice for filing his successive postconviction petition and remanded his petition for second-stage proceedings. At this time, the door had been opened for a young-adult offender to demonstrate, through an adequate factual record, that his own specific characteristics were so like those of a juvenile that the imposition of a mandatory life sentence without the procedural safeguards established in *Miller* was a violation of the proportionate penalties clause. See *People v. Horshaw*, 2024 IL App (1st) 182047-B, ¶ 49. Our supreme court

13

had recognized that emerging adults may rely on the evolving neuroscience and societal standards underlying the ruling in *Miller* to support as-applied challenges to life sentences brought pursuant to the proportionate penalties clause. *Id.* ¶¶ 48-50; *People v. Daniels*, 2020 IL App (1st) 171738, ¶ 25.

¶ 32    However, the supreme court had not yet conclusively determined whether *Miller* provided cause for a defendant advancing an as-applied proportionate penalties challenge in a successive postconviction petition. Since our 2020 decision, the supreme court has directly addressed that question, and the following case law has limited a defendant's ability to bring such claims in successive postconviction petitions.

¶ 33    In *People v. Dorsey*, our supreme court held that, although *Miller* announced a new substantive rule under the eighth amendment, *Miller* did not provide cause for a defendant to raise a claim under the proportionate penalties clause. *People v. Dorsey*, 2021 IL 123010, ¶ 74. In making this decision, the supreme court reasoned that "Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing." *Id.* Accordingly, the supreme court concluded that, at best, *Miller*'s unavailability prior to 2012 only "deprived defendant of some helpful support for his state constitutional law claim, which is insufficient to establish cause." (Internal quotation marks omitted.) *Id.* The supreme court then relied on *Dorsey* in *Clark*, when it extended its holding to successive postconviction claims based on a defendant's intellectual disabilities. *Clark*, 2023 IL 127273, ¶¶ 66-67. In *Clark*, the supreme court concluded that the unavailability of *Miller* did not impede a defendant's ability to present his proportionate penalties claim on direct appeal or his opportunity to raise the claim in his first postconviction petition. *Id.* ¶ 67.

14

¶ 34 Shortly thereafter, the supreme court decided *Moore* and held that two 19-year-old young-adult offenders sentenced to discretionary life sentences could not rely on the unavailability of *Miller* to establish the requisite cause for their failure to raise their youth-based proportionate penalties challenges in their original postconviction proceedings. *Moore*, 2023 IL 126461, ¶¶ 1, 40-42. The supreme court concluded that *Miller* did not directly apply to young adults and thus did not provide cause for a young-adult offender to raise a proportionate penalties clause claim. *Id.* ¶ 40. The supreme court reiterated that, "long before *Miller*, Illinois law recognized the special status of juvenile offenders for purposes of applying the principles under the proportionate penalties clause." (Internal quotation marks omitted.) *Id.* ¶ 41. In addition, the supreme court noted that the evidence and arguments raised at the defendants' sentencing hearings showed that the parties knew Illinois law recognized the special status of young adults. *Id.* ¶ 42. The supreme court found that, "*Miller* does not present new proportionate penalties clause principles with respect to discretionary sentencing of young adult offenders. Instead, [the] defendant had the essential legal tools to raise his present proposed claim under the proportionate-penalties clause when he filed his previous postconviction petitions." (Internal quotation marks omitted.) *Id.* Accordingly, the supreme court concluded that, since *Miller* "did not change the law applicable to young adults," it did not provide cause for the proportionate penalties challenges advanced by the defendants in their successive postconviction petitions. *Id.*

¶ 35 Relying on the above case law, the State here contends that, since the supreme court's ruling is contrary to this court's previous determination that defendant had established cause, we must reverse the trial court's order for resentencing. The State also contends that this court's previous ruling was palpably erroneous since *Miller* does not provide cause for a young-adult offender to raise a claim under the proportionate penalties clause.

15

¶ 36    In response, defendant recognizes the holding in *Moore* but contends that *Moore* does not foreclose his proportionate penalties claim because *Moore* was distinguishable in key respects. Defendant argues that, as *Moore* is not precisely on point, the contrary ruling exception to the law of the case doctrine is not satisfied, and *Moore* does not render this court's prior order palpably erroneous.

¶ 37    First, defendant notes that the sentences in *Moore* were discretionary life sentences whereas his life sentence was mandatory. Thus, he argues that the holding in *Moore* only applies to emerging adult offenders who received discretionary, not mandatory, life sentences.

¶ 38    This argument has been addressed by the First District in *People v. Horshaw*, 2024 IL App (1st) 182047-B, ¶ 58. There, the appellate court noted that previous First District cases had found that the factual distinction between mandatory and discretionary life sentences was irrelevant for purposes of *Moore*'s holding as a "life sentence [was] a life sentence whether it [was] mandatory or discretionary." *Id.* Although *Horshaw* acknowledged that this interpretation had broad ramifications for indigent defendants with no legal training and essentially left these defendants with no path to demonstrate their rehabilitative potential simply because of timing, the appellate court noted that it was bound by the supreme court's decision in *Moore*. *Id.* ¶¶ 60-62. The appellate court noted that the supreme court's decisions had indicated that "the claim at issue in this case should be viewed as nothing more than an extension of proportionate penalties claims that have existed all along and that defendant did not need *Miller* or *Miller*-related proportionate penalties precedent to raise the claim now at issue." *Id.* ¶ 62. Accordingly, the appellate court found that the defendant could not establish cause for his failure to raise his proportionate penalties claim in his initial postconviction petition because that claim was always available to him in some form. *Id.* ¶ 63.

¶ 39    In arguing that *Moore* is limited to discretionary life sentences, defendant notes that *Moore* states as follows: "*Miller* does not present new proportionate penalties clause principles with respect to discretionary sentencing of young adult offenders." See *Moore*, 2023 IL 126461, ¶ 42. However, like *Horshaw*, we conclude that there was nothing in *Moore* to suggest that *Moore* had limited its holding to discretionary life sentences. While *Moore* does, at times, use the term "discretionary," the sentences at issue there were discretionary, not mandatory, life sentences. Notably, *Moore* also stated, with no distinction between discretionary and mandatory life sentences, that, "[a]s *Miller* did not change the law applicable to young adults, it does not provide cause for the proportionate penalties challenges advanced in [the] proposed successive postconviction petitions." *Moore*, 2023 IL 126461, ¶ 42. Thus, for the specific purposes of establishing cause to raise a proportionate penalties clause claim based on *Miller*, we find that *Moore* did not distinguish between mandatory and discretionary life sentences. Therefore, we conclude that *Moore*'s holding that *Miller* and its progeny do not provide cause for a young-adult offender to raise a proportionate penalties clause claim applies to discretionary life sentences as well as mandatory life sentences.

¶ 40    Second, defendant notes that, while the sentencing courts in *Moore* considered the defendants' ages in relation to the proportionate penalties clause as mitigation, and still imposed a life sentence, the sentencing court in this case believed it had no choice but to impose a mandatory life sentence regardless of any mitigating factors. However, as we have concluded that the holding in *Moore* applied to mandatory life sentences, as well as discretionary life sentences, and we are bound by the supreme court's decision, we find that defendant's argument is without merit.

¶ 41    Third, defendant notes that, unlike the defendants in *Moore*, defendant's claim is not solely dependent on *Miller*, as his claim is also based on new scientific developments and expert

testimony applying those scientific advancements directly to him. This evidence consists of several news articles explaining the applicable neuroscience principles; an affidavit from Dr. Bigler, explaining the advances in the research since the Supreme Court decided *Miller*; and Dr. Garbarino's January 11, 2023, report and subsequent testimony applying the advances in neuroscience to defendant. It is notable that none of this evidence was in existence at the time of defendant's direct appeal or his initial postconviction petition. However, Illinois courts have long recognized that developed adults are different from young adults who are still developing. See *e.g.*, *People v. Haines*, 2021 IL App (4th) 190612, ¶ 47 ("Illinois courts *** have long been aware that less than mature age can extend into young adulthood—and they have insisted that sentences take into account that reality of human development."). Therefore, defendant here did not need corroborating evidence about the developments in neuroscience research before he could raise his proportionate penalties claim. Although this external evidence provided helpful support for his claim, the "question is not whether subsequent legal developments have made it easier to raise the claim" (internal quotation marks omitted) (*id.* ¶ 49). "Rather, the question is whether, at the time of the initial postconviction proceeding, Illinois law provided the tools with which to raise the claim." *Id.* As already established by the previously discussed case law, the unavailability of more current research did not prevent defendant from raising his proportionate penalties clause claim in an earlier proceeding as, at that time, he already had "the essential legal tools" necessary to raise such a claim. See *Moore*, 2023 IL 126461, ¶ 42. Accordingly, we conclude that, under *Miller* and its progeny, defendant cannot establish cause for his failure to raise his proportionate penalties clause claim in a prior proceeding.

¶ 42 Since the supreme court's opinion in *Moore*, which addressed the same issue as decided in our January 2020 decision, was issued *after* this court directed the trial court to docket defendant's

successive postconviction petition for second-stage postconviction proceedings, we find that the contrary ruling exception to the law of the case doctrine applies. See *Rommel v. Illinois State Toll Highway Authority*, 2013 IL App (2d) 120273, ¶ 19 ("The 'contrary ruling' exception applies where the higher court decides the precise question contrary to the rule announced in the appellate court." (Internal quotation marks and emphasis omitted.)); *People v. Anderson*, 2015 IL App (2d) 140444, ¶ 30 (the contrary ruling exception only applies if there was a recent supreme court decision addressing the same issue). Accordingly, as we are bound to follow the supreme court's decision in *Moore*, we must reverse the trial court's order for resentencing because *Miller* did not provide cause for a young-adult offender, such as defendant, to raise a claim under the proportionate penalties clause.

¶ 43                                III. CONCLUSION

¶ 44     For the foregoing reasons, we reverse the judgment of the circuit court granting defendant a resentencing hearing and remand with directions that defendant's successive postconviction petition be dismissed.

¶ 45     Reversed and remanded with directions.