2026 IL App (1st) 240305
No. 1-24-0305
Opinion filed June 26, 2026

Sixth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 99 CR 2258 01 |
| | ) | |
| JUAN SANCHEZ, | ) | The Honorable |
| | ) | Michael Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice C.A. Walker concurred in the judgment and opinion.
Justice Gamrath dissented, with opinion.

**OPINION**

¶ 1    Defendant Juan Sanchez appeals from the second-stage dismissal of his successive postconviction petition, challenging his mandatory natural-life sentence as unconstitutional under the proportionate penalties clause. While recent supreme court caselaw has found that petitioners have always had the essential legal tools to raise these claims, we agree with Sanchez that the evolving brain science on adolescent development provides him with reason to bring this claim now, more than two decades after his sentencing hearing.

¶ 2    Further, because we take his factual allegations as true at this stage, we find that Sanchez made a substantial showing of a constitutional violation. In addition to this new science, his petition describes growing up under abuse and neglect, as well as coming of age in an environment that normalized sexual relationships between teenagers and men. Given his young age at the time of his offense, Sanchez was already more prone to impulsive and immature behavior, and his chaotic and violent background furthered this risk. Sanchez's claim should be heard in full at an evidentiary hearing. We reverse and remand.

¶ 3                              I. BACKGROUND

¶ 4    Juan Sanchez sought postconviction relief, attacking as unconstitutional his mandatory natural-life sentence. The trial court had imposed that sentence under a recidivism statute (720 ILCS 5/12-14(d)(2) (West 1998)), despite asserting it was "clearly not convinced" that Sanchez, who was 20 years old at the time of the offense, should be in prison for the rest of his life.

¶ 5    Many years after that sentencing hearing, the circuit court granted Sanchez leave to file a successive postconviction petition attacking his sentence in part by citing the evolving science on adolescent brain development and pertinent life experiences. But at the second stage of proceedings, the court dismissed the petition without an evidentiary hearing on the new science supporting Sanchez's claim.

¶ 6                             A. Bench Trial

¶ 7    T.T. testified that she accompanied Juan Sanchez, a 20-year-old friend of the family, to run errands when she was 13 years old. (We refer to T.T. by her initials, consistent with custom. *People v. Munoz-Salgado*, 2016 IL App (2d) 140325, ¶ 1 n.1). Sanchez parked the car and tried to kiss her, but she pushed him away. Undeterred, he continued to kiss her, undress her, and penetrate her vagina with his fingers and penis. When he stopped, T.T. put on her clothes and jumped in the

back seat as Sanchez drove off. When she recognized where they were, she fled from the car and ran back to the mall where Sanchez had picked her up. A doctor testified to observing bruises on T.T.'s nipples and around her vagina. Out of court, Sanchez admitted having sex with T.T. but denied she had told him to stop. The court found Sanchez guilty of aggravated criminal sexual assault.

¶ 8     At sentencing, Sanchez spoke about changing his life around while awaiting trial for several years. The court considered laudatory letters from the chaplains running the life learning program at the jail. And the presentence investigation noted, among other things, that Sanchez suffered physical and mental abuse by his mother while a child. In aggravation, the State presented Sanchez's prior conviction for criminal sexual assault, which he committed three years before this offense, at age 17.

¶ 9     Given that prior conviction, the sentencing court concluded that the law "mandates" a mandatory natural-life sentence. 720 ILCS 5/12-14(d)(2) (West 1998). But the trial court stated that, although Sanchez should receive a harsh punishment, it was "clearly not convinced" that Sanchez should be in prison for life.

¶ 10                              B. Direct Appeal

¶ 11     Sanchez contended on appeal that his sentence violated (1) the proportionate penalties clause of our state constitution (see Ill. Const. 1970, art. I, § 11.); (2) his federal constitutional rights pursuant to the rule announced in *Apprendi v. New Jersey*, 530 U.S. 466 (2000); and (3) his right to a trial by jury under our state constitution. We affirmed. *People v. Sanchez*, 344 Ill. App. 3d 74, 77 (2003).

¶ 12                     C. Prior Collateral Proceedings

¶ 13    In 2004, Sanchez first petitioned for postconviction relief. The circuit court summarily dismissed his petition as frivolous and patently without merit. This court affirmed. *People v. Sanchez*, No. 1-04-2986, 365 Ill. App. 3d 1103 (2006) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 14    In 2006, Sanchez sought relief from judgment under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2006)). The circuit court dismissed his petition. This court affirmed. *People v. Sanchez*, 384 Ill. App. 3d 1089 (2008) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 15                     D. Successive Postconviction Proceedings

¶ 16    In 2019, Sanchez sought leave to file a successive postconviction petition. Relying in part on evolving science on adolescent brain development, he contended that his mandatory life sentence violated the proportionate penalties clause of our state constitution. He attached many studies in support, each written by a scientist or legal scholar. He contended that his own actions in this case "could be attributed to adolescent brain underdevelopment" and that, given his young age during both offenses, he had a "strong potential" for rehabilitation.

¶ 17    In 2020, the circuit court advanced Sanchez's petition to the second stage and appointed counsel.

¶ 18    In 2023, counsel supplemented the petition by (i) cataloging recent supreme court caselaw; (ii) appending additional material on the evolving science on adolescent brain development; and (iii) arguing, with citation to a 13-page affidavit Sanchez wrote, how Sanchez experiences leading up to the assault evinced his lack of maturity, his vulnerability to negative influences, and his lack of a fixed character. Counsel contended: "Not only was recent caselaw and scientific evidence

regarding emerging adults not available at [the] 2001 sentencing, but the sentencing court was unable to use any individualized information it had available at the time."

¶ 19    In 2024, the circuit court dismissed Sanchez's petition, granting the State's motion. The court first found that *res judicata* barred Sanchez's claim because he had challenged the sentence as a violation of the proportionate penalties clause on direct appeal. Next, citing *People v. Dorsey*, 2021 IL 123010, the court found that Sanchez could not establish cause for failing to raise this claim in his initial postconviction petition. Finally, the court found that Sanchez failed to show how the evolving brain science he cited applied to him.

¶ 20                                    II. ANALYSIS

¶ 21    Sanchez contends that (i) *res judicata* does not bar his as-applied proportionate penalties claim; (ii) he established cause and prejudice, thus permitting him to bring this claim in a successive postconviction petition; and (iii) he made a substantial showing that a natural-life sentence is unconstitutional as applied to him, necessitating an evidentiary hearing.

¶ 22    We find that Sanchez raised this claim on direct appeal and, thus, *res judicata* could bar him from bringing it again. But we relax that bar because we find that he has established cause and prejudice. Further, because he has made a substantial showing of a constitutional violation, he may litigate this claim at an evidentiary hearing that will test his assertions, taken as true for now, that his brain was functionally like a juvenile's and the sentencing court erred by imposing a mandatory natural-life sentence.

¶ 23                    A. Successive Postconviction Proceedings

¶ 24    The Post-Conviction Hearing Act (Act) contemplates the filing of one petition by right and successive petitions with leave of court. 725 ILCS 5/122-1(f) (West 2022). This process ensures that procedural rules do not undermine fundamental fairness. *People v. Blalock*, 2022 IL

126682, ¶ 38. Petitioners litigate successive petitions by invoking the "cause and prejudice" exception. *Id.*

¶ 25    Petitioners can establish "cause" by identifying an objective factor that prevented them from raising a specific claim during the initial postconviction proceedings. 725 ILCS 5/122-1(f) (West 2022). The supreme court has observed " ' "that a showing that the factual or legal basis for a claim was not reasonably available to counsel" ' " will establish cause. *People v. Pitsonbarger*, 205 Ill. 2d 444, 460 (2002) (quoting *Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999), quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). A petitioner can establish "prejudice" by showing the claimed constitutional error so infected the trial that the resulting conviction or sentence violated due process. *People v. Davis*, 2014 IL 115595, ¶ 14.

¶ 26    We review *de novo* whether Sanchez has established cause and prejudice, allowing him to litigate his claim in a successive postconviction petition. *People v. Bailey*, 2017 IL 121450, ¶¶ 13, 26. Likewise, we review *de novo* whether Sanchez made a substantial showing of a constitutional violation. *People v. Coleman*, 183 Ill. 2d 366, 388-89 (1998).

¶ 27                              B. *Res Judicata*

¶ 28    The circuit court found that *res judicata* barred Sanchez from litigating his claim that a natural-life sentence is unconstitutional under the proportionate penalties clause as applied to him. *Res judicata* is a common law doctrine that operates in postconviction proceedings as it does elsewhere. *People v. Blair*, 215 Ill. 2d 427, 443 (2005). Under the doctrine, petitioners generally may not raise claims they previously litigated. See Black's Law Dictionary (8th ed. 2004) (*res judicata* is an "issue that has been definitively settled by judicial decision").

¶ 29    In *Dorsey*, for example, the supreme court held that *res judicata* barred a petitioner from litigating a proportionate penalties claim in successive postconviction proceedings because the

petitioner had raised a proportionate penalties claim on direct appeal. *Dorsey*, 2021 IL 123010, ¶ 73. And here, as in *Dorsey*, Sanchez raised a proportionate penalties claim on direct appeal. *Sanchez*, 344 Ill. App. 3d at 84-85 (distinguishing *People v. Leon Miller*, 202 Ill. 2d 328, 340-41 (2002) (*Leon Miller*)). Thus, *res judicata* would ordinarily bar Sanchez from litigating this claim once more. See *People v. Clark*, 2023 IL 127273, ¶ 42 ("[D]efendant is asking this court for leave to file a highly disfavored successive postconviction petition to revisit a constitutional issue that was decided on direct appeal and, therefore, is barred by the *res judicata* doctrine.").

¶ 30　But principles of fundamental fairness allow courts to relax the effect of the *res judicata* doctrine. *Id.* ¶ 45. Under the Act, courts may do so if the petitioner satisfies the cause and prejudice doctrine. *Id.*

¶ 31　　　　　　　　　　　　　　　　C. *Cause*

¶ 32　Sanchez contends he has established cause because "[n]ow, with the emergence of late adolescent brain science, Illinois courts have created a new framework" for emerging adults raising as-applied proportionate penalties claims. And "[u]nder this framework, raising the claim that [his] sentence shocked the moral sense of the community such that it violated the proportionate penalties clause requires reliance on, and reference to, adolescent brain science that was not developed and constitutionally significant until 2012."

¶ 33　Essentially, Sanchez advances two claims about cause: (i) a new legal basis ("new framework") and (ii) a new factual basis ("adolescent brain science") permit courts to relax the bar of *res judicata* so petitioners like him may litigate in successive postconviction proceedings.

¶ 34　　　　　　　　　　　1. No Legal Basis for Cause

- 7 -

¶ 35    To be sure, as Sanchez contends, courts previously held that petitioners established cause by pointing to *Miller v. Alabama*, 567 U.S. 460 (2012), and later cases. See generally *People v. Brewer*, 2025 IL App (1st) 240088, ¶¶ 25-31 (discussing developing caselaw on legal cause).

¶ 36    In *Dorsey* and *People v. Moore*, 2023 IL 126461, however, the supreme court rejected the idea that petitioners could establish cause by showing that a new legal basis (*Miller*) was not reasonably available to them during initial postconviction proceedings. In *Dorsey*, the supreme court discussed how "Illinois courts have long recognized the differences between persons of mature age and those who are minors for purposes of sentencing." *Dorsey*, 2021 IL 123010, ¶ 74. In *Moore*, the supreme court pointed out that " 'the essential legal tools' " had always been available for petitioners to use during initial postconviction proceedings. *Moore*, 2023 IL 126461, ¶ 42 (quoting *Clark*, 2023 IL 127273, ¶ 93); see *People v. Harris*, 2018 IL 121932, ¶¶ 46, 48 (directing defendant to raise similar claim in initial postconviction petition).

¶ 37    Following *Dorsey* and *Moore*, we reject Sanchez's assertion that *Miller* provides him with a new legal basis as cause to pursue his claim in successive postconviction proceedings.

¶ 38                              2. Factual Basis for Cause

¶ 39    Sanchez contends that "new science creates cause *** to collaterally attack his mandatory life sentence in a successive [postconviction] petition." (Emphasis omitted.) Sanchez's *pro se* filing primarily attached studies in support, each written by scientists or legal scholars, but largely neglected to apply those insights to Sanchez's own history. But counsel supplemented that filing with an affidavit from Sanchez and arguments applying those scientific insights to Sanchez's own history. Together, these filings established a new factual basis for cause.

¶ 40    Particularly helpful is a study published after the filing of Sanchez's *pro se* petition, which counsel cited in the circuit court to argue that scientific research shows that Sanchez's brain was

more like a juvenile's than an adult's. We have reviewed the study, "White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys and Policy Makers" (White Paper), which summarizes "mainstream" thought in "developmental neuroscience" as of 2022, "the time it was produced." Catherine Insel *et al.*, *White Paper on the Science of Late Adolescence: A Guide for Judges, Attorneys and Policy Makers*, Ctr. for L., Brain & Behav. at Mass. Gen. Hosp. (2022), https://clbb.mgh.harvard.edu/white-paper-on-the-science-of-late-adolescence/ [https: perma.cc/26HY-6Q7T].

¶ 41 In the White Paper, the authors state that "scientific research has emerged which reinforces the reasoning of the *Miller* decision and, *if its implications are accepted*, extends much of the science that resonated with the *Miller* court to late adolescents (ages 18-21)." (Emphasis added.) *Id.* at 2. The authors also state in the introduction that researchers can now "identify the 'transient immaturity' of youth and emerging young adults and the normal process of self-desistence from criminal misconduct that occurs with maturation," based on "a robust scientific basis." *Id.* at 6-7.

¶ 42 Also helpful is a declaration, attached to the *pro se* petition, by Dr. Erin Bigler in an unrelated case. Dr. Bigler cites her training as a neuropsychologist and discusses, in a general way, the science underlying brain development after the teenage years. She recounts how recent studies have demonstrated that people at age 20 are, on average, at their peak of risk-taking and sensation-seeking, have low impulse control, are short-sighted, and are still developing their decision-making processes.

¶ 43 Dr. Bigler's declaration thus reinforces other insights appearing in the White Paper. These characteristics of people at age 20, which are tied to brain processes are exacerbated by negative social contexts and trauma in youth and can be reversed "after reductions of stress occur." But the

inability of some youth to escape environmental stresses impairs the development of their brains beyond adolescent processes.

¶ 44    Sanchez's use of this new science, and its connection to his sentencing claim, patterns itself after the claim raised in *Blalock*. There, the Illinois Supreme Court found that "pattern and practice" evidence provided a factual basis for litigating a second successive petition where the police had tortured the petitioner into making an inculpatory statement. *Blalock*, 2022 IL 126682, ¶¶ 41-46. The petitioner attached new evidence in his petition, including printouts from the 2012 Torture Inquiry and Relief Commission database, affidavits from other alleged victims of abuse by the detectives involved, and complaints made to the Chicago Police Department Office of Professional Standards. *Id.* ¶¶ 30, 40. The supreme court held that the petitioner had established cause because, while Blalock knew about the torture before trial, he lacked corroborating evidence to support his claim when filing his petition for postconviction relief. *Id.* ¶¶ 41-46.

¶ 45    By appending these reports, Sanchez has presented the circuit court with one of two key factual bases for establishing cause. See *id.* ¶¶ 30, 40 (recounting evidence petitioner cited in support of claim). For example, the study presents a "robust scientific basis" for applying *Miller*'s insights to emerging adults. Indeed, more than 10 years ago, our supreme court declined to resolve an emerging adult's sentencing claim in *People v. Thompson*, 2015 IL 118151, ¶ 38, because the record contained no "factual development on the issue of whether the rationale of *Miller* should be extended beyond minors under the age of 18."

¶ 46    That said, the law has not yet reached the juncture where neuroscience alone compels recognition of the claims of emerging adults just like the claims of juveniles. See, *e.g.*, *Davis*, 2014 IL 115595, ¶ 43 (finding *Miller*, 567 U.S. 460, provided cause for juvenile to file successive petition); *Harris*, 2018 IL 121932, ¶ 60 (noting "line drawn by the [United States] Supreme Court

at age 18 was not based primarily on scientific research"). And counsel's supplement to Sanchez's petition was likewise key to corroborating his claim and establishing cause. *Blalock*, 2022 IL 126682, ¶¶ 41-46; see *People v. Williams*, 2024 IL 127304, ¶¶ 35-36 (providing example of petitioner-specific allegations pertinent to as-applied claim for emerging adult). As counsel summarized, the affidavit traces "the arc of [Sanchez's] life, from an abused and neglected child to an immature young adult, to a rehabilitated and remorseful 45-year-old man," contributing to society even while incarcerated. But the unavailability of this new science at sentencing in 2001 particularly hurt Sanchez, whose only sentence (absent that new science as applied to him under the proportionate penalties clause) was mandatory life in prison.

¶ 47     Accordingly, Sanchez established cause. *Pitsonbarger*, 205 Ill. 2d at 460; see *Williams*, 2024 IL 127304, ¶¶ 35-36.

¶ 48                                        *Prejudice*

¶ 49     Sanchez contends he also established prejudice because the sentencing court's "comments demonstrated that it would not have sentenced Juan to life imprisonment were it not [then] mandatory." We agree.

¶ 50     Generally, a petitioner establishes prejudice by showing the claimed constitutional error so infected the trial that the resulting conviction or sentence violated due process. *Davis*, 2014 IL 115595, ¶ 14. Here, the record demonstrates that the court sentenced Sanchez without regard to Sanchez's youth-attendant circumstances.

> "[T]he law doesn't give me much choice in this matter which basically ties my hands. So it makes my decision easy and it makes it difficult. Although I believe you should receive a harsh penalty, clearly not convinced that life without parole is the penalty. But be that as it may, the state legislature and the populace that elects the state legislature controls what

the laws are in this state. And I cannot sentence you to anything but life imprisonment in Illinois. And the law mandates that I do that."

The sentencing court imposed a mandatory natural-life sentence under section 12-14(d)(2) of the Criminal Code of 1961 (720 ILCS 5/12-14(d)(2) (West 1998)) without exercising the discretion it otherwise would have and, thus, raised a doubt about the constitutional validity of the sentence it imposed. See *Clark*, 2023 IL 127273, ¶ 72.

¶ 51    That Sanchez was sentenced for an offense he committed at 20 years old does not undermine his claim. To be sure, the Illinois Supreme Court has held that the circuit court should find the petitioner has not established prejudice if the petitioner's claim fails as a matter of law. *Id.* ¶ 70. And, in *Williams*, the supreme court "cast[ ] doubt" the ability of a 22-year-old petitioner to raise a claim like Sanchez's. *Williams*, 2024 IL 127304, ¶ 29 (distinguishing *Harris*, 2018 IL 121932, and *Thompson*, 2015 IL 118151). But unlike *Williams*, Sanchez was 20 years old at sentencing, which falls within Illinois's apparent, historical cutoff of 21 years. See *People ex rel. Bradley v. Illinois State Reformatory*, 148 Ill. 413, 418-19 (1894) (describing historical statute for the reformation of "minors between the ages of [10] and [21]").

¶ 52    Accordingly, in addition to cause, Sanchez established prejudice permitting him to litigate his claim anew in successive postconviction proceedings. *Clark*, 2023 IL 127273, ¶ 45.

¶ 53                                          E. *Substantial Showing*

¶ 54    Sanchez contends he substantially showed that his sentence violates the Illinois Constitution by pleading facts to establish (i) the evolving brain science of late adolescence; (ii) details of his "abusive childhood, negative influences, and the social context surrounding his crime"; (iii) specifics of his "stellar prison record since his arrest in 1999"; and (iv) the inability of the sentencing court to factor in his youth when imposing a mandatory life sentence. We agree.

¶ 55    The proportionate penalties clause to the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Our supreme court has recognized that emerging adults may raise proportionate penalties claims based on the concerns articulated in *Miller*. See *Clark*, 2023 IL 127273, ¶ 87.

¶ 56    The clause's emphasis on rehabilitative potential provides limitations on penalties beyond those afforded by the eighth amendment (U.S. Const., amend. VIII). *People v. Clemons*, 2012 IL 107821, ¶¶ 39-41. To invoke those protections, petitioners must show how their sentence is " 'cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community.' " *Clark*, 2023 IL 127273, ¶ 51 (quoting *Leon Miller*, 202 Ill. 2d at 338). Our supreme court has not specified exactly which sentences meet this standard because as society evolves, so do its concepts of decency and fairness, which shape a community's moral sense. *Id.*

¶ 57    But in this context, the supreme court's caselaw provides clear guideposts.

> "[A] life sentence without parole *is* shocking to the moral sense of the community if it was imposed upon an emerging adult defendant who has established that [(i)] the science underlying *Miller* and its progeny applies to his or her specific facts and circumstances and [(ii)] his or her age and youth-attendant circumstances were not considered at the original sentencing hearing before that life sentence was imposed." (Emphasis in original.) *People v. Green-Hosey*, 2025 IL App (2d) 240284, ¶ 59, *appeal allowed*, No. 131560 (Ill. Sept. 24, 2025).

¶ 58    Equally clear is Sanchez's burden at this stage of proceedings. "The substantial showing required to avoid dismissal at the second stage is greater than the standard that must be satisfied to obtain leave to file a successive petition." *People v. Robinson*, 2020 IL 123849, ¶ 43. And "[t]he

question raised in an appeal from an order dismissing a post-conviction petition is whether the allegations in the petition, liberally construed and taken as true, are sufficient to invoke relief under the Act." *Coleman*, 183 Ill. 2d at 388.

¶ 59                    Evolving Science Applies to Sanchez

¶ 60    Contrary to the circuit court's finding, the detail in Sanchez's affidavit about his childhood and teenage years, along with the scientific evidence on childhood trauma, substantially demonstrates that evolving adolescent brain science applies to him. Liberally construed and taken as true, Sanchez's statements connects this science to his (i) general decision-making, (ii) his actions during the offense, and (iii) his rehabilitative potential.

¶ 61                    F. *Decision-making Generally*

¶ 62    As the White Paper explains, exposure to threats in childhood impacts emotional regulation neuro-processes: "Exposure to threat has the greatest impact on the brain processes that are involved in detecting threats, learning from emotional information, and regulating emotions." Insel, *supra* at 19. Moreover, being deprived of basic needs, such as food and sleep, "most often influences the development of brain systems important for language development and executive function." *Id.*

¶ 63    Sanchez detailed the ways in which he was trapped in a home environment of threats, abuse, stress, and trauma and a social environment, throughout his youth, that normalized inappropriate sexual behavior. He described how living in this environment impacted his cognitive function early on, citing an inability to stay awake in school and comprehend his school materials, symptoms of dyslexia and attention deficit disorder, a lack of social skills, anger, and fighting. The chronic abuse of his mother in their home, with a frequently absent father who only brought more violence when he came home, falls into the category of adverse childhood experiences (ACEs)

that have been found to have "profound long-term deleterious effects on the physical and mental health of adults." So does his mother's substance abuse and his father's incarceration.

¶ 64 Further, Sanchez was especially vulnerable to a disrupted psychological and sexual development. Early on, he would hear his mother having sex with men she brought home from bars. Moreover, his mother accused his father of sexually assaulting his sister. Then, his stepmother sexually assaulted him twice when he was 15 years old and living in his father's home. That his father ultimately kicked him out of the house deprived him of the limited stability he had. Indeed, moving homes frequently and changing schools further added to an already unstable day-to-day life.

¶ 65 Finally, as Sanchez avers, all these incidents occurred within a larger social-cultural context where adults were often engaged in sexual relationships with teenagers, including his father and stepmother.

¶ 66 Accordingly, liberally construed and taken as true, Sanchez substantially showed that his normal psychological, emotional, and sexual development was likely hindered, keeping him in the tumultuous stage of psychological adolescence longer than the typical young person.

¶ 67 G. *Decision-making During Offense*

¶ 68 Moreover, the undisputed facts of the offense arguably reveal Sanchez's underdeveloped responsibility and impulsiveness, as well as sexually inappropriate behavior that was apparently common. That Sanchez drove T.T. back toward the mall after the assault, knowing that she would go right back to her family, indicates a complete misunderstanding of her experience of the encounter, and a total lack of calculation of what might happen next.

¶ 69                                  H. *Rehabilitation*

¶ 70    Finally, mitigation at sentencing and Sanchez's personal growth since then suggest that his character was not fully formed at the time of the offense. *People v. Zumot*, 2021 IL App (1st) 191743, ¶ 34 (postsentencing conduct relevant to whether 19-year-old possessed rehabilitative potential incompatible with the imposition of a life sentence). He has no criminal record from his time in prison. In fact, he was moved from maximum security to medium security. And as averred, his spiritual leadership, academic progress, and artistic growth further demonstrate his rehabilitation and personal development, as does his relatively new relationship and regular contact with his son, who was an infant when he was arrested. See *People v. Wilson*, 2022 IL App (1st) 192048, ¶ 92 (noting petitioner's personal growth during incarceration, as reported in affidavit, including regular contact with 16-year-old daughter, indicates prior criminal conduct at 19 reflected the transient characteristics of youth).

¶ 71              Sentencing Law Barred Court from Considering Sanchez's Youth

¶ 72    The circuit court erred by concluding that the sentencing court factored Sanchez's past into its sentencing decision. As the sentencing court noted, the legislature's mandate that Sanchez receive a natural life sentence precluded it from considering anything in mitigation. Sanchez made a substantial showing that the sentencing court imposed a mandatory natural-life sentence under section 12-14(d)(2) of the Criminal Code of 1961 (720 ILCS 5/12-14(d)(2) (West 1998)) without exercising the discretion it otherwise would have and thus raised a doubt about the constitutional validity of the sentence it imposed. See *Clark*, 2023 IL 127273, ¶ 72.

¶ 73                                  III. CONCLUSION

¶ 74    For the reasons stated, we reverse the second-stage dismissal of defendant's successive postconviction petition and remand for a full evidentiary hearing.

- 16 -

1-24-0305

¶ 75    Reversed and remanded.

¶ 76    JUSTICE GAMRATH, dissenting:

¶ 77    Sanchez previously raised and lost a proportionate penalties challenge to his sentence on direct appeal. *People v. Sanchez*, 344 Ill. App. 3d 74, 77 (2003). He offers no valid reason to bypass *res judicata*, attaching only generalized, untested "scientific" literature and his own affidavit to his petition, which he could have presented earlier. Sympathy for Sanchez's natural life sentence cannot justify compromising legal consistency or lowering the bar for establishing cause. I therefore respectfully dissent.

¶ 78    While I agree with my esteemed colleagues that *Miller* does not supply a new legal basis for cause, I disagree that Sanchez has shown any new factual basis sufficient to show cause to pursue his claim. This court has repeatedly rejected the argument that recent neuroscientific research can provide the necessary cause to raise a proportionate penalties claim in a successive postconviction petition. See, *e.g.*, *People v. Ascencio*, 2026 IL App (1st) 241534-U, ¶ 36; *People v. Lowe*, 2026 IL App (1st) 241544-U, ¶ 49; *People v. Ross*, 2026 IL App (1st) 232431-U, ¶ 22; *People v. Minniefield*, 2025 IL App (1st) 240463-U, ¶¶ 66-67; *People v. Scaggs*, 2025 IL App (1st) 240953-U, ¶¶ 46, 49-51; *People v. Robinson*, 2025 IL App (1st) 231419-U, ¶¶ 59, 62-64; *People v. Boclair*, 2025 IL App (1st) 240911-U, ¶¶ 43-44; *People v. Malone*, 2025 IL App (1st) 231881-U, ¶ 18; *People v. Searles*, 2024 IL App (1st) 210043-U, ¶¶ 13-17. Nothing here justifies departing from that sound and consistent line of authority.

¶ 79    The "new science" Sanchez cites consists of the White Paper published in 2022, a declaration by Dr. Erin Bigler prepared for a wholly unrelated case, and other generalized reports and opinions, none of which pertain specifically to Sanchez. This is insufficient to establish cause.

¶ 80    As *Searles* explained, research predating Sanchez's direct appeal and initial postconviction petition already recognized that brain development continues into the twenties. *Searles*, 2024 IL App (1st) 210043-U, ¶ 14 (citing Jay N. Giedd *et al.*, *Brain Development During Childhood and Adolescence: A Longitudinal MRI Study*, 2 Nature Neuroscience 861 (1999), https://cs.brown.edu/people/tdean/projects/cortex/course/suggested_reading_list/supplements/documents/GieddetalNN-99.pdf [https://perma.cc/4UBH-Y8HA]). Legal scholars have likewise relied on such research for decades to argue that young adults and adolescents are less culpable than fully mature adults. *Id.* (citing, *e.g.*, Lucy C. Ferguson, *The Implications of Developmental Cognitive Research on "Evolving Standards of Decency" and the Imposition of the Death Penalty on Juveniles*, 54 Am. Univ. L. Rev. 441 (2004)). Although newer studies might strengthen Sanchez's argument, they do not constitute new evidence that he was previously unable to present. *Id.* Sanchez had ample opportunity to gather evidence for his claim, and "if the caselaw underpinning [his] claim does not provide cause, then [his] delayed investigation of the claim based on the lack of the caselaw cannot provide cause either." *People v. French*, 2022 IL App (1st) 220122, ¶ 33.

¶ 81    Even if scientists had only recently "discovered" the continuation of brain development into young adulthood, such information would merely confirm what courts have long recognized. Illinois courts have consistently acknowledged "the differences between persons of mature age and those who are minors for purposes of sentencing" (*People v. Dorsey*, 2021 IL 123010, ¶ 74), emphasizing the need for sentences to reflect the realities of human development. See, *e.g.*, *People v. Haines*, 2021 IL App (4th) 190612, ¶ 47 ("Illinois courts *** have long been aware that less than mature age can extend into young adulthood—and they have insisted that sentences take into account that reality of human development."); *People v. Maldonado*, 240 Ill. App. 3d 470, 485-86

(1992) (sentencing requires careful consideration of the defendant's personal history, including age, mentality, habits, and social environment); *People ex rel. Bradley v. Illinois State Reformatory*, 148 Ill. 413, 422-23 (1894) (recognizing sentencing distinctions between "persons of mature age" and minors ages 16 to 21).

¶ 82    To constitute cause, new evidence must be of such character that its prior absence effectively prevented the defendant from raising the claim earlier. See *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 59 ("If the acquisition of new scientific knowledge to support an already viable claim were all that a defendant needed to show in order to raise the claim years late, then the 'cause' requirement of section 122-1(f) would be a weak threshold indeed."). Sanchez's inability to point to more current research did not prevent him from raising this argument in his direct appeal, initial postconviction petition, or section 2-1401 petition. *People v. Jones*, 2025 IL App (5th) 230511-U, ¶ 41.

¶ 83    This case bears no resemblance to *People v. Blalock*, 2022 IL 126682, where newly surfaced pattern and practice evidence, which was uniquely difficult to obtain and controlled by the State, established cause for a coerced confession claim. There, without such evidence, the defendant was effectively barred from raising the claim at all. *Id.* ¶ 44.

¶ 84    No comparable barrier exists here. Sanchez could always recount his childhood, cite existing developmental research, and attempt to apply it to his circumstances. This is not a situation like *Blalock* and other cases, where cause existed because external, previously inaccessible evidence surfaced later. See *People v. Weathers*, 2015 IL App (1st) 133264, ¶ 36 (cause established where an Illinois Torture Inquiry and Relief Commission report issued after defendant's initial postconviction petition was resolved); *People v. Wrice*, 2012 IL 111860, ¶¶ 41, 49 (accepting the State's concession that cause existed where a government report was released after defendant filed

his initial postconviction petition). Sanchez had full ability to make his arguments earlier; he simply did not. He thus has not shown fundamental fairness requires relaxing the *res judicata* bar.

¶ 85     When this court affirmed Sanchez's conviction and natural life sentence, it recognized that the recidivist sentencing provision under which he was sentenced aims to deter repeat offenders and impose stricter penalties on those resistant to correction. *Sanchez*, 344 Ill. App. 3d at 82. The legislature intended mandatory life sentences for repeat sexual assault offenders to address harm to victims and protect the public by curbing sexually harmful conduct. *Id.* at 83, 85. This purpose should not be undermined for a repeat offender whose claim fails the cause and prejudice test or is barred by *res judicata*, having already raised a proportionate penalties issue on direct appeal.

¶ 86     Because Sanchez has not established legal or factual cause, entitling him to further litigate a successive postconviction petition, I would affirm the circuit court's dismissal. For these reasons, I respectfully dissent.

---

*People v. Sanchez*, **2026 IL App (1st) 240305**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 99-CR-2258-01; the Hon. Michael Obbish, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Emelia H. Carroll, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, David H. Iskowich, and Amy McGowan, Assistant State's Attorneys, of counsel), for the People. |

---